IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 00-20009

LUIS F. MOTA,

Plaintiff-Appellee,

versus

THE UNIVERSITY OF TEXAS HOUSTON HEALTH SCIENCE CENTER; ET AL.,

Defendants,

THE UNIVERSITY OF TEXAS HOUSTON HEALTH SCIENCE CENTER,

Defendant - Appellant.

Appeal from the United States District Court
for the Southern District of Texas

August 9, 2001

Before HIGGINBOTHAM and BENAVIDES, Circuit Judges, and DUPLANTIER,[*]
District Judge.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This case presents claims under Title VII of retaliation and
sexual harassment by a member of the same sex. A professor at the
University of Texas Houston Health Science Center filed suit,
alleging that he was harassed by his supervisor. He also claimed
that the University retaliated against him for lodging complaints

[*] District Judge of the Eastern District of Louisiana, sitting
by designation.

with the University and the EEOC. Following a jury trial, the district court entered judgment for the plaintiff on these claims, awarding compensatory damages, back pay, front pay, attorney's fees, and costs.

The University challenges the court's denial of its motion for judgment as a matter of law, asserting error on an array of legal and factual grounds. The University argues that the jury's retaliation verdict was not supported by an adverse employment action and lacked an adequate basis in fact; that the alleged acts of harassment were not sufficiently severe or pervasive; that the jury erred in finding that the University had not established its affirmative defenses to the harassment claim; and that the court's award of front pay, attorney's fees, and costs was an abuse of discretion. We affirm the court's judgment in virtually all respects, vacating only a portion of its award of costs.

I

Dr. Luis F. Mota, a resident alien from Caracas, began work in 1993 as a visiting professor in the Department of Periodontics at the Dental Branch of the University of Texas Houston Health Science Center.[1] He began his first year as a tenure-track professor with the University in 1995. At all relevant times, Dr. Raul Caffesse was the head of the Periodontics Department at the Dental Branch.

---

[1] The University is a state educational system. *See* Tex. Educ. Code §§ 65.02(a)(9) (Vernon's 2001).

Caffesse and Mota knew each other prior to Mota's term at the University. Mota's parents, who were also periodontists, knew Caffesse and would receive him into their home on social visits. Likewise, Caffesse would entertain Mota's parents when they traveled to the United States. After Mota moved to Houston, he continued this social relationship with Caffesse and Caffesse's family.

Caffesse's stature as a renowned periodontist prompted Mota to apply for a position at the University. Caffesse, who had an endowed professorship named after him at the Dental School, was considered to be among the ten most famous academic periodontists in the world.

In June 1996 Mota and Caffesse participated in a three-day conference in Monterrey, Mexico. The event was jointly sponsored by the Dental School and the University of Nuevo Laredo. Although Mota was not originally scheduled to attend, Caffesse told Mota several days before the trip that he should accompany him as a representative of the Dental School. Caffesse arranged for them to share the same hotel room.

Mota later testified that Caffesse engaged in unwanted and offensive sexual conduct toward him while they were in the hotel room. During their time in Mexico, Caffesse allegedly told Mota that he had to "get along with him and that people who worked with him had to get along with [him] and that he only wanted to know [Mota] better." Caffesse also suggested that Mota's immigration

3

status could be jeopardized if he no longer worked at the University.

Following the trip to Monterrey, Caffesse promised Mota that the incidents which occurred in Mexico would not happen again. He also told Mota that he had arranged for him to give a presentation at another seminar and that Mota would receive a $500 honorarium. Mota asserts that he took the honorarium money and purchased a present for Caffesse in excess of the $500. According to Mota, the gift was motivated by his desire not to be indebted to Caffesse.

Despite Caffesse's assurances, incidents of harassment allegedly continued. Mota later testified that Caffesse engaged in unwanted and offensive sexual advances at conferences he attended in Philadelphia, Breckenridge, and Orlando. Caffesse also allegedly engaged in other acts of sexual harassment while he and Mota were in Houston. In the face of Caffesse's advances, Mota canceled conference engagements which he knew Caffesse would also attend.

The record also supports the inference that Caffesse threatened Mota. During one conference, Mota refused to room with Caffesse. Caffesse angrily raised his hand in the air and told Mota that he could not do that to him and could not work in the department if Mota kept rejecting him. On another occasion, Caffesse allegedly told Mota that the University would defend Caffesse—as it allegedly had in the past—in any type of complaint brought against him. Caffesse further informed Mota that Caffesse disliked certain persons at the school, and that he had "helped

4

them to leave" the school. He regularly admonished Mota not to tell anyone of his advances.

On April 23, 1997, Mota submitted a detailed, written sexual harassment complaint against Caffesse to the University. According to Mota, he and a member of the Sexual Harassment Board had agreed that the investigatory panel would not include persons who had past dealings with Caffesse or who were associated with the Dental or Medical schools. Prof. George Stancel was appointed chairman of the three-member panel. Stancel was a medical school professor who apparently had worked closely with the spouse of a professor who worked regularly with Caffesse. Stancel later testified that he was aware of Caffesse's stature at the Dental School and that he had met him on at least one occasion.

The members of the panel concluded that they were unable to determine whether or not Caffesse had violated the University's sexual harassment policy. During the investigation, Caffesse admitted to the panel that he had sexually propositioned Mota on two trips following the Mexico trip. Another member of the University testified before the panel that "if you cross Caffesse, you are definitely in trouble. In other words, if you tell him 'no' you better watch out."

Although Mota had recorded conversations with Caffesse, he did not submit these to the panel. The panel never asked for such evidence; nor was the panel aware of its existence. Mota later

played the tapes to the jury in the trial before the district court.

Upon issuing its decision, the panel notified Mota and suggested that, if he had new evidence, he could request a reopening of his case. Despite the evidence contained on the tapes, Mota did not ask the panel to reopen the case. Four days after the decision, Mota requested "protection against further harassment and retaliation" by Caffesse. In response, Caffesse told the Dean of the Dental School, Dr. Ronald Johnson, that he was willing to work out an arrangement acceptable to Mota, under which the two professors could continue working in the Periodontics Department.

Dean Johnson did not learn of Mota's University complaint until July 16, 1997, when Mota sent him a courtesy copy of a complaint he had filed with the EEOC.[2] University policy prohibits the panel from notifying the appropriate administrative authority in the University that a complaint has been filed. According to M. David Low, the University president, Johnson was the person responsible for protecting Mota from retaliation.

In a meeting with Caffesse and Mota on July 23, 1997, Dean Johnson asked Mota to write a memo describing parameters under which he would feel comfortable working in the Department. When Mota declined to do so, Johnson instructed Caffesse to draft the

---

[2] Mota filed a complaint with the EEOC on July 14, 1997.

document. The next day, Caffesse sent Mota a letter outlining guidelines.

In response to the charges of retaliation contained in Mota's EEOC complaint, the University hired an outside attorney to conduct an investigation. The University contends that Mota did not cooperate with the attorney, whose April 9, 1998 report concluded that no retaliation had occurred.

Mota does not allege that any further acts of sexual harassment occurred after the filing of his April 1997 complaint. He contends, however, that the University retaliated against him. First, he asserts that, in the wake of his complaint, Caffesse arranged Mota's schedule so as to bring them into constant contact. Mota alleges that Caffesse made this scheduling decision in the face of Mota's objections. When Caffesse relented and changed Mota's schedule, he reassigned him from some of the desirable graduate clinics to the less prestigious undergraduate clinics.

On August 20, 1997, Johnson and Low denied Mota a $2,500 stipend for serving as the Dental School clinical coordinator. Mota had been the clinical coordinator since late 1995. However, the University contends that Mota had not performed the duties of clinical coordinator since September 1996. The University argues that the discontinuation of Mota's stipend resulted from an inquiry sent by Mota to Johnson, in which Mota stated that he continued to receive supplemental pay for the clinical coordinator position. Johnson testified that he stopped payment simply to correct an

administrative oversight, as the University would not pay someone who was not doing the work required by the position.

On September 10, 1997, the University denied Mota's request for a paid six-month leave of absence. President Low denied Mota's request, yet authorized six months of unpaid leave beginning November 3, 1997.[3] Mota was to return to work on May 1, 1998.

While Mota was on leave, he began looking for another job and visited his parents in Venezuela several times. He also requested that the University grant him access to his office, a microscope, and the library to allow him to conduct research while on leave. Johnson refused these requests, denying him access to a microscope and preventing him from entering his office. Johnson further ordered Mota's name removed from the University letterhead and from his office. He prevented Mota from serving on mock oral boards and thesis committees. He also refused to allow him to teach a seminar in Spain, through which Mota could have earned $2,000. Mota also alleges that Johnson and other University professors ostracized him, warning students not to associate with him. Johnson allegedly told one graduate student that if he ever caught the student in contact with Mota, the University would disqualify him as a student.

---

[3] During the first twelve weeks of leave, Mota apparently received benefits through the Family and Medical Leave Act. Johnson described the balance of Mota's leave period as "administrative leave."

In an undated letter, Mota requested an additional six months of unpaid personal leave. Low and Johnson refused the requested extension, informing Mota that they would consider his failure to resume work after May 26, 1998 to be a resignation from the faculty. This letter denied the extension ostensibly because Mota gave no reasons for the request. In his letter, Mota had cited his hope for a "mutually beneficial resolution." Low and Johnson stated that an extension would not facilitate this objective and would not be in the best interests of either Mota or the University. When Mota did not return to work on May 26, 1998, the University terminated him. Three months later, Mota accepted a lower-paying position with the University of Pittsburgh.

On April 30, 1998, Mota filed suit against the University in the United States District Court for the Southern District of Texas, alleging sexual harassment and retaliation. Mota subsequently amended his complaint to add a claim against Caffesse, in his individual capacity, for defamation and intentional infliction of emotional distress. The trial judge ultimately dismissed the intentional infliction of emotional distress claim. After Caffesse and Mota entered into a settlement agreement for $290,000, the court then dismissed all remaining claims against Caffesse.

Following a six-day trial, a jury returned a verdict against the University. The jury found that Mota had been subjected to unlawful sexual harassment; that the harassment did not result in

a tangible employment action against Mota; that the University failed to exercise reasonable care to prevent and promptly correct harassing behavior towards Mota; that Mota did not unreasonably fail to take advantage of preventive or corrective opportunities made available by the University; and that the University retaliated against Mota. The jury awarded $15,000.00 in compensatory damages, $104,435.00 in back pay, and delivered an advisory verdict of $328,565.00 in front pay.

In an order dated December 8, 1999, Judge Gilmore awarded $388,367.51 to Mota for attorney's fees and expenses. The court also awarded the judgment amount plus interest for compensatory damages and back pay, yet reduced the jury's recommended front pay to $194,989.00. On December 20, 1999, the court denied the University's motion for judgment as a matter law and to amend the judgment. The University appeals this ruling and the December 8 final judgment.

II

The University contends that the district court erred in denying its motion for judgment as a matter of law on Mota's Title VII retaliation claim. This Court reviews the denial of a motion for judgment as a matter of law de novo, according to the same standard applied by the district court.[4] Judgment as a matter of

_____

[4] *See Stokes v. Emerson Elec. Co.*, 217 F.3d 353, 356 (5th Cir. 2000).

law is warranted if, after viewing the record in the light most favorable to the non-moving party, there is no "legally sufficient evidentiary basis" for a reasonable jury to have found for the prevailing party.[5] "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"[6]

To state a claim for retaliation, a plaintiff must establish that: (1) he engaged in protected activity, as described in Title VII; (2) he suffered an adverse employment action; and (3) a causal nexus exists between the protected activity and the adverse employment action.[7] "Protected activity" is defined as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII.[8] "Adverse employment actions" include only "ultimate employment decisions .

---

[5] *See id.*

[6] *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000) (quoting 9A C. Wright & A. Miller, *Federal Practice and Procedure* § 2529 (2d ed. 1995)); *see also id.* at 150 (noting that the standard governing motions for judgment as a matter of law mirrors the summary judgment standard of review).

[7] *Arnold v. U.S. Dep't of Interior*, 213 F.3d 193, 198 (5th Cir. 2000).

[8] *See* 42 U.S.C. § 2000e-3(a) (2001); *Evans v. City of Houston*, 246 F.3d 344, 352-53 (5th Cir. 2001).

. . 'such as hiring, granting leave, discharging, promoting, and compensating.'"[9] An employer's action does not rise to the level of an "adverse employment action" when it fails to have more than "mere tangential effect on a possible future ultimate employment decision."[10] To demonstrate causation, the employee "must show that 'but for' the protected activity, the adverse employment action would not have occurred."[11] If the plaintiff presents evidence supporting the prima facie case, plus evidence that the reasons given by the employer for the adverse employment action were pretextual, a jury may infer the existence of retaliation.[12]


A

The University argues, first, that Mota can not demonstrate the existence of an adverse employment action. Although the jury found that Mota was subjected to sexual harassment, it determined that the sexual harassment did not result in a "tangible employment action." The Supreme Court has defined "tangible employment action" as "a significant change in employment status, such as hiring,

---

[9] *Walker v. Thompson*, 214 F.3d 615, 629 (5th Cir. 2000) (quoting *Dollis v. Rubin*, 77 F.3d 777, 782 (5th Cir. 1995) (per curiam)).

[10] *Id.* at 629.

[11] *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999).

[12] *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000); *Ratliff v. City of Gainesville*, 2001 WL 736004, at *3-*4 (5th Cir. July 17, 2001).

firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[13] A tangible employment action in most cases inflicts direct economic harm and must involve an official act by the company.[14] In this case, the jury charge included a definition of "tangible employment action" which substantially incorporated these elements.[15]

The University asserts that a tangible employment action is substantially equivalent to an adverse employment action. The University points to the similarity between the type of actions encompassed by the two categories. It contends that the jury's finding of no tangible employment action precludes the existence of an adverse employment action for purposes of Mota's retaliation claim.

This argument is without merit. The jury was given a separate instruction for retaliation, in which the court noted that an

_____

[13] *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

[14] *See id.* at 762-63.

[15] The jury charge read in relevant part:

A "tangible employment action" means a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. Such an action in most cases inflicts direct economic harm. Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates, and require an official act of the company.

13

adverse employment action was required. The court's explanation of adverse employment action was similar to its previous definition of tangible employment action.[16] In finding that the University had retaliated against Mota, however, the jury implicitly found that an adverse employment action had been taken. Moreover, the relevant employment action resulting from sexual harassment, as opposed to retaliation, may differ. Retaliation occurs in response to protected activity, whereas a tangible employment action is the result of the harassment itself. A rational jury could have concluded both that no tangible employment action resulted from the harassment and that the University subsequently retaliated against Mota for filing a complaint.

B

The University next argues that many of the actions asserted by Mota do not rise to the level of "adverse employment actions." Mota contends that the following events were causally linked to the filing of his complaints with the University and the EEOC: (1) the University placed Caffesse in charge of monitoring any further harassment; (2) Mota was ostracized by faculty and students; (3) he was barred from entering the Dental School; (4) Mota's name was removed from his office door and from the University letterhead;

---

[16] The court instructed the jury that "[a]n adverse employment action is a significant change in employment status and includes discharge, demotion, refusal to promote, denial of leave request, change in compensation, or a major change in responsibilities."

14

(5) Mota was stripped of his duties as principal investigator on certain projects; (6) the University prevented Mota from continuing to serve on mock oral boards and on thesis committees; (7) the University refused to allow him to teach seminars in Spain (which would have yielded some $2,000); (8) the University ceased paying Mota a $2,500 annual stipend; (9) the University refused to grant Mota paid leave; (10) the University denied his request for an extension of unpaid leave; and (11) the University treated Mota's failure to return by May 26, 1999 as a resignation. Although some of the preceding events do not qualify as "ultimate employment decisions,"[17] at least four of the actions allegedly taken by the University meet this definition. Moreover, the evidence regarding these events provides ample support for the jury's finding of retaliation.

1

The University's discontinuation of Mota's $2,500 stipend on August 20, 1997 is a compensation decision, thereby qualifying as an adverse employment action.[18] The University characterizes the action as merely a "business decision,"[19] contesting the jury's

---

[17] For instance, ostracism by fellow employees does not constitute an "ultimate employment decision." *See Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707-08 (5th Cir. 1997).

[18] *See Walker v. Thompson*, 214 F.3d 615, 629 (5th Cir. 2000).

[19] The University appears to concede that this event would, if given the interpretation advocated by Mota, constitute an adverse

inference of retaliation. The University argues that the "undisputed evidence" reveals that Mota had not been fulfilling the duties of clinical coordinator since September 1996, when Dr. Walter E. Dimmitt allegedly assumed Mota's position. However, Mota testified that Dimmitt was given the separate position of "clinical director," not "clinical coordinator." Mota testified that he continued to serve as clinical coordinator until Dean Johnson and President Low removed him from this position on August 20, 1997. The record also contains a letter, dated August 29, 1997, in which Mota denies having relinquished these duties. A rational jury could infer from this evidence that the University's reasons for discontinuing Mota's stipend were pretextual.

2

The University also argues that its denial of Mota's request for paid leave was not causally linked to his sexual harassment complaint.[20] As the University observes, the record does not indicate that a similarly situated employee was denied six months of paid leave. The University implies that the causal link between Mota's protected activity and the denial of his paid leave request is consequently too tenuous to support a jury finding. However,

employment action.

[20] The University implicitly concedes that the denial of paid leave constitutes an adverse employment action. *See Walker*, 214 F.3d at 629.

while the fact that no similarly situated faculty member was denied paid leave may cast doubt on Mota's retaliation claim,[21] it is not dispositive.

A rational jury could have found that the University's denial of paid leave was causally related to Mota's protected activity. The University's Handbook of Operating Procedures stated that paid leave could be granted "for a wide variety of reasons." A jury could conclude that the University refused to exercise its discretion to grant Mota paid leave. The University asserts that Mota was ineligible for paid leave, arguing that he had exhausted all accrued paid sick and annual leave prior to November 1997. The University's position is not compelled by the record, and a jury could have determined that the proffered reason for denying Mota paid leave was pretextual. Indeed, the jury's finding that the University had already retaliated against Mota by discontinuing his stipend further supports an inference of retaliatory animus in the paid leave context.

3

The University also asserts that its denial of Mota's request for an extension of his unpaid leave can not support a retaliation claim. "[E]mployment actions are not adverse where pay, benefits,

---

[21] *See Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1185-86 (5th Cir. 1997).

and level of responsibility remain the same."[22] The University contends that denial of unpaid—as opposed to paid—leave can not be an adverse employment action because it does not deprive Mota of pay, benefits, or level of responsibility.

The University's contention is without merit. Unpaid leave facially qualifies as a benefit. This Court has recognized that the granting of leave, more generally, is an "ultimate employment decision."[23] This Court has not differentiated between paid and unpaid leave. Moreover, it is difficult to conceive of a principled basis for such a distinction.[24] The University's argument consequently fails.[25]

A rational jury could conclude that the University retaliated against Mota by denying his request for additional unpaid leave. Although the University asserts that Mota was granted medical

---

[22] *Watts v. Kroger Co.*, 170 F.3d 505, 512 (5th Cir. 1999).

[23] *See Walker*, 214 F.3d at 629.

[24] *Cf. Rowe v. Laidlaw Transit, Inc.*, 244 F.3d 1115, 1118 (9th Cir. 2001) (finding no basis for distinguishing between paid and unpaid leave for purposes of the FMLA and that such a distinction would frustrate the statute's purpose of protecting employees from adverse employment decisions).

[25] The cases cited by the University are inapposite. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70-71 (1986), is a religious accommodation case. Moreover, *Nashville Gas Co. v. Satty*, 434 U.S. 136, 145 (1977), was superseded by the 1978 amendments to the Civil Rights Act of 1964. *See* Pub. L. No. 95-555, 92 Stat. 2076 (1979) (codified as amended at 42 U.S.C. § 2000e(k)); *Somers v. Aldine Indep. Sch. Dist.*, 464 F. Supp. 900, 902-03 (S.D. Tex. 1979).

18

leave, Mota testified that he was granted "personal leave," which may be granted for up to twelve months. The record indicates that another University employee was granted one year of unpaid personal leave because his wife did not like the weather in Houston. In the face of an arguably more compelling rationale—i.e., Mota's difficulties with Caffesse and his medical problems[26]—the University refused Mota's request for the same amount of unpaid leave. The University informed Mota that the grant of additional leave was not in the best interests of the University. It argued at trial that Mota had failed to provide a "legitimate, documented reason for an extension of his leave." The University further asserted that Mota had already accepted a position with the University of Pittsburgh at the time of his request.

A jury could have disbelieved each of these proffered justifications, concluding that the University's explanation for refusing Mota's request was a pretext for retaliation. First, Mota testified at trial that no documentation beyond that which he had already supplied the University was necessary. A jury could have credited this assertion. Second, Mota asserts that he had not yet accepted a position in Pittsburgh at the time of the denial of his request for leave. Indeed, the record contains a letter from the Provost of the University of Pittsburgh, dated August 19, 1998,

---

[26] According to Mota's doctors and his own testimony, Mota experienced an array of psychological and minor medical problems in the wake of the incidents involving Caffesse.

19

which indicates the formal approval of Mota's appointment as Visiting Assistant Professor of Periodontics. The jury could have reasonably inferred from this evidence that Mota had not accepted the offer by May 19, 1998, when the University denied his request for additional leave.[27] The evidence supports a jury finding of retaliation.

4

A rational jury also could have determined that the University ultimately terminated Mota because of his involvement in protected activity. Although the University asserts that Mota resigned, a jury could have found that it terminated him. In fact, Mota submitted a letter dated June 26, 1998, in which he contests Johnson's assertion that he had resigned.

The record supports the inference that Mota's termination was motivated by retaliatory animus. Mota's ostracism at the hands of University employees and the University's decision to strip of him of certain duties and privileges support a finding of retaliatory animus. This conclusion is strengthened by a finding that the University retaliated against Mota by discontinuing his stipend and denying his leave requests. We therefore find no error in the

---

[27] A jury also could have concluded that the University intended to create immigration difficulties for Mota, as his visa was set to expire on July 14, 1998. Given the impending expiration of Mota's visa, a jury could have inferred that the University's denial of additional leave was motivated by retaliatory animus.

district court's refusal to enter judgment as a matter of law on Mota's retaliation claim.

## III

### A

The University contends that the trial court erred in entering judgment on Mota's sexual harassment claim. The University argues, first, that Caffesse's harassment of Mota was not sufficiently severe or pervasive.[28] The plaintiff in a hostile work environment claim must establish that: (1) he belongs to a protected class; (2) was subjected to unwelcome sexual harassment; (3) the harassment was based on his sex; (4) the harassment affected a term, condition, or privilege of his employment; and (5) the employer knew or should have known of the harassment and failed to take remedial action.[29] A hostile work environment claim requires the presence of a work environment that a reasonable person would find hostile or abusive.[30] "Whether an environment is hostile or abusive depends on a totality of circumstances, focusing on factors such as the frequency of the conduct, the severity of the conduct, the

---

[28] The University does not contest the proposition that Title VII prohibits same-sex harassment. The Supreme Court conclusively resolved this issue in *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998).

[29] *Cain v. Blackwell*, 246 F.3d 758, 760 (5th Cir. 2001).

[30] *See DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 594 (5th Cir. 1995).

degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance."[31] This Court has held that "[d]iscriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment that violates Title VII."[32]

A jury could rationally infer that Caffesse's conduct was sufficiently extreme as to create a hostile work environment. The evidence supports a finding that Caffesse engaged in repeated, aggressive sexual advances in the face of adamant refusals by Mota. A jury could find this conduct to be humiliating and degrading, particularly in conjunction with Caffesse's threats. Although much of this conduct was verbal, there was also evidence of repeated physical contact. Moreover, the record reflects that Mota suffered emotional distress and psychological problems in the wake of the harassment. Although there is little evidence that Mota's performance as a teacher and researcher suffered at the time of the harassment, the record does reflect that he came to avoid engagements and conferences at which Caffesse was also present.[33]

---

[31] *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996).

[32] *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000).

[33] Tangible detriment to an employee's work performance is only one factor to be considered in a hostile work environment claim. *See Harris v. Forklift System, Inc.*, 510 U.S. 17, 21 (1993).

Indeed, Mota felt compelled to take a leave from his position in the wake of Caffesse's actions. There was sufficient evidence to support the jury's finding of harassment.

B

The University further argues that the trial court lacked jurisdiction to consider Mota's Title VII harassment claims to the extent that they are based on events occurring in Mexico. The University essentially contends that federal jurisdiction does not lie given the extraterritorial events alleged and the fact that Mota is not a U.S. citizen.[34]

Assuming *arguendo* the validity of Mota's Title VII interpretation, subject matter jurisdiction would not be present if the events in Mexico were the sole basis for Mota's harassment claim.[35] However, Mota's claim is also supported by alleged acts of

---

[34] Title VII does not govern aliens employed outside the United States. *See* 42 U.S.C. §§ 2000e(f) (2001) ("With respect to employment in a foreign country, such term [employee] includes an individual who is a citizen of the United States."); 2000e-1(a) ("This subchapter shall not apply to an employer with respect to the employment of aliens outside any State . . . ."); *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 95 (1973); *Iwata v. Stryker Corp.*, 59 F. Supp. 2d 600, 603 (N.D. Tex. 1999). The University implicitly concedes that Title VII protections apply to an alien employed in the United States. *See Espinoza*, 414 U.S. at 95. We offer no opinion as to whether Mota's participation in a three-day conference in Mexico deprives him of Title VII protection.

[35] *Cf. Boureslan v. ARAMCO, Arabian Am. Oil Co.*, 892 F.2d 1271 (5th Cir. 1990) (en banc) (affirming dismissal of Title VII claim for lack of subject matter jurisdiction on the basis of extraterritoriality concerns), *aff'd*, *EEOC v. Arabian Am. Oil Co.*,

23

harassment in Breckenridge, Houston, Orlando, and Philadelphia. Given the preceding incidents, which occurred in the United States, the University can not demonstrate that Mota's harassment claim is "wholly insubstantial and frivolous."[36] As Mota states a potentially viable harassment claim, federal jurisdiction is present.[37]

C

The University also challenges the jury's finding that it did not establish affirmative defenses to Mota's harassment claim. Where harassment does not result in a tangible employment action, the defendant may offer the following affirmative defenses: "(1) the employer exercised reasonable care to prevent and correct promptly any such sexual harassment, and (2) the employee unreasonably failed to take advantage of any preventative or

---

499 U.S. 244 (1991).

[36] *Holland/Blue Streak v. Barthelemy*, 849 F.2d 987, 989 (5th Cir. 1988) (per curiam).

[37] *Cf. Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (holding that a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief). The University might have challenged the court's decision to allow the jury to hear evidence relating to the events in Mexico, arguing that such evidence is either irrelevant or unduly prejudicial. *See* Fed. R. Evid. 401, 403 (2001). We express no opinion as to the merits of such an argument, however, as the University failed to articulate this position on appeal. The University has therefore waived any contention on these grounds. *See Yohey v. Collins*, 985 F.2d 222, 224-25 (5th Cir. 1993).

24

corrective opportunities provided by the employer or to avoid harm otherwise."[38]

## 1

A jury could reasonably conclude that the University failed to exercise reasonable care to prevent and promptly correct harassment. The jury could conclude that the panel's failure to discipline Caffesse or take more affirmative steps against him was unreasonable.  In this case, the University decided to simply let Mota and Caffesse work out a mutually agreeable accommodation. Although an employer need not use the most serious sanction available to punish an offender,[39] the University did not even find that Caffesse had engaged in sexual harassment. Nor did the University issue a reprimand or warning, despite its policy against even consensual sexual relations between supervisors and subordinates. In the past, the school had reprimanded other supervisors who had engaged in consensual relationships with subordinates.[40] Finally, the University's retaliation against Mota

---

[38] *Casiano v. AT&T Corp.*, 213 F.3d 278, 284 (5th Cir. 2000). Mota does not appeal the jury's finding that there was no tangible employment action.  The University therefore construes his claim as a "hostile environment" action. *See id.*

[39] *See Landgraf v. USI Film Products*, 968 F.2d 427, 430 (5th Cir. 1992), *aff'd*, 511 U.S. 244 (1994).

[40] *Cf. Walker v. Thompson*, 214 F.3d 615, 627 (5th Cir. 2000) (holding that the employer did not demonstrate as a matter of law that it exercised reasonable care in correcting racially harassing

undermines its claim that it was attempting to prevent future harassment.

2

The evidence also supports the jury's finding that Mota took advantage of available remedies. The University criticizes Mota for not having filed his complaint with the Harassment Board sooner and for failing to disclose tapes of conversations with Caffesse.

This Court has not articulated a bright-line test regarding when a delay in filing a complaint becomes "unreasonable." Mota filed his complaint in late April 1997, approximately nine months after the incidents in Mexico and eight months after the events in Philadelphia. Although this Court's jurisprudence indicates that a delay of three months appears not to be excessive,[41] a delay of eight or nine months is more problematic. However, in light of Caffesse's repeated threats of retaliation, a jury could infer that Mota's delay was not unreasonable. Mota may have believed that resort to the University's administrative process was ineffectual, given Caffesse's influence at the University. According to Mota's testimony, Caffesse told him that the University would protect and defend him against any complaint. Thus, Mota's delay in filing his complaint does not warrant reversing the jury's determination.

behavior).

[41] *See Watts v. Kroger Co.*, 170 F.3d 505, 510-11 (5th Cir. 1999).

26

A jury could also find that Mota's failure to disclose tape recordings of conversations between him and Caffesse was not unreasonable. Mota fully participated in the investigation, testifying before the panel and providing an extensive written complaint. He may have viewed the production of additional evidence, such as recordings of conversations, as futile, given his concerns over the effectiveness of the panel's inquiry, the composition of the panel, and Caffesse's influence. A jury could have concluded that Mota's actions did not constitute an unreasonable failure to take advantage of preventive or corrective opportunities.

In sum, a jury could have determined that the University failed to meet its burden of proof in establishing its affirmative defenses. The district court did not err in entering judgment on Mota's sexual harassment claim.

IV

A

The University contends that the court's award of front pay was an abuse of discretion.[42] Front pay is a form of equitable relief contemplated by Title VII and is intended "to compensate the

---

[42] *See Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 44 (5th Cir. 1992) (applying abuse of discretion standard).

plaintiff for lost future wages and benefits."[43] "[F]ront pay may be awarded if reinstatement is not feasible where" a hostile relationship exists between the employer and the plaintiff.[44] Although front pay is an equitable remedy for the district court to determine, the court may empanel an advisory jury.[45]

In considering the jury's advisory award of $328,565.00 in front pay, the district court took into account the University's post-trial conduct. This was not error.[46] After initially reducing

---

[43] *Id.; see* 42 U.S.C. § 2000e-5(g)(1) (2001); *see also Pollard v. E.I. du Pont de Nemours & Co.*, 121 S. Ct. 1946, 1950 (2001).

[44] *Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 257 (5th Cir. 1996).

[45] *See Rutherford v. Harris County*, 197 F.3d 173, 188 (5th Cir. 1999); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 423 n.19 (5th Cir. 1998); Fed. R. Civ. P. 39(c) (2001).

[46] The University implies that the email should have been subjected to the procedural safeguards of an evidentiary hearing. Assuming *arguendo* that the University had a due process right to a hearing, it waived that right by failing to ask the court for a hearing on the basis of the email. *See Boddie v. Connecticut*, 401 U.S. 371, 378-79 (1971). The University had ample notice of the basis for a possible hearing request, as Mota noted the implications of the email in three separate pleadings prior to the court's entry of final judgment. Although the University moved for an evidentiary hearing on equitable relief, it did not argue that the email warranted such a hearing. The University waived any putative hearing right. *See Bueno v. City of Donna*, 714 F.2d 484, 492-93 (5th Cir. 1983).
The University also contends that the message is inadmissible hearsay. This argument is meritless. The email was competent evidence as either a verbal act, *see* Fed. R. Evid. 801(a) (2001); *Tompkins v. Cyr*, 202 F.3d 770, 779 n.3 (5th Cir. 2000) (stating that a threatening letter was a verbal act, and not a "statement" for purposes of the hearsay rule); as evidence of Low's state of mind, *see* Fed. R. Evid. 803(3) (2001); or as evidence of its impact on Mota, *see United States v. Ballis*, 28 F.3d 1399, 1405 (5th Cir.

the jury's recommended award to reflect only ten years of lost future wages, the court added five additional years of front pay based on an email sent by President Low to all 8,000 University employees. The court determined that the email, which Low sent the day after the jury verdict, was the continuation of a pattern of vindictive behavior demonstrated at trial. In the email, Low expressed his disappointment over the jury's finding of retaliation, stating: "I want to make it very clear that [Mota] was not fired, but rather failed to return to his faculty duties upon expiration of leave that he had requested and was granted by UT-Houston." The district court portrayed the email as attempting to "present Mota in the worst professional light possible." The court also concluded that this behavior would impact Mota's future work prospects. On this basis, the court reduced the jury's front pay award to $194,989.00. We find no abuse of discretion.


B

The University also contends that the front pay awarded by the court failed to take into account the fact that, at the time Mota left the University in 1998, he would not have been considered for tenure at the University until he had completed four more years of work. It contends that the court gave Mota a windfall by treating

---

1994); *United States v. Kirk*, 844 F.2d 660, 663 (5th Cir. 1988). Mota did not submit the letter to "prove the truth of the matter asserted" therein. Fed. R. Evid. 801(c) (2001).

him as if he had tenure by the time he left the University. However, the University does not point to any specific evidence to refute the court's calculations. The court attempted to reconcile the pay disparity between Mota's position at the University and the lower-paying position he was forced to take in Pittsburgh. This was not an abuse of discretion.


C

The University further challenges the court's award of attorney's fees. A district court's award of attorney's fees is reviewed for abuse of discretion.[47] The University first contends that the fee award was excessive in comparison with fee awards entered in other Title VII cases requiring more time and attention. The University fails to address the court's application of the *Johnson* factors,[48] and makes only a conclusory assertion about comparable awards. The two cases cited by the University involve substantially lower hour totals and billing rates.[49] The University's failure to object to specific hours worked and the

---

[47] *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

[48] *See id.* at 433-37; *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).

[49] *See Purcell v. Seguin State Bank & Trust Co.*, 999 F.2d 950, 961 (5th Cir. 1993) (upholding award of $75,000 in fees based on 500 hours worked and $150 per hour billing rate); *Shipes v. Trinity Indus.*, 987 F.2d 311, 319-23 (5th Cir. 1993) (affirming $144,712.70 fee award based on 1,306.88 hours worked and billing rates of $165 per hour and $140 per hour).

reasonableness of the rates charged renders its argument meritless.[50]

D

The University also contends that the court failed to segregate fees incurred through Mota's dispute with Caffesse from those generated by his litigation with the University. The University contends that the majority of discovery disputes were between Mota and Caffesse, who had separate legal counsel. The University accordingly seeks a set-off from the $290,000 in settlement proceeds Mota received from Caffesse's insurers. It argues that the settlement fund presumably compensated Mota's attorneys for their efforts against Caffesse. The University invokes the general presumption against double recovery.[51]

Mota urges this Court to uphold the award as a reasonable exercise of the district court's discretion. He contends that the University failed to preserve its objection at the trial level because it did not offer reasons in support of its argument that individual entries were duplicative. This argument fails, however,

---

[50] We note that, although the court did not award sanctions for the University's conduct, it observed that the University had engaged in numerous discovery abuses, "many of which were extremely frivolous in nature and clearly appeared to be an attempt to harass or intimidate the Plaintiff." The court concluded that these abusive tactics prolonged the litigation between the parties and partially justified the magnitude of Mota's fee award.

[51] *See In re Texas General Petroleum Corp.*, 52 F.3d 1330, 1340 (5th Cir. 1995).

as Mota concedes that the University pointed out specific items to the trial court. Moreover, "the burden of proof of reasonableness of the number of hours is on the fee applicant, and not on the opposing party to prove their unreasonableness."[52]

Mota contends that the award itself was reasonable and not duplicative. Mota's counsel represented to the trial court that they had carefully segregated time spent on the case which was unique to Caffesse. The district court reasonably credited this assertion. The court also found that the majority of claims against Caffesse were "inextricably intertwined with the claims against the University and that it would be impossible to segregate all of the time for purposes of making a determination of attorney's fees." A court need not segregate fees where the facts and issues are so closely interwoven.[53] Moreover, until the settlement, Caffesse and the University coordinated their defense efforts. The preceding considerations amply support the district court's award.

E

Mota also refutes the University's suggestion that it receive a credit for the settlement with Caffesse. He points out that cases in which a court awards a settlement credit to a non-settling

---

[52] *Leroy v. City of Houston*, 831 F.2d 576, 586 (5th Cir. 1987) (citation omitted).

[53] *See Abell v. Potomac Ins. Co.*, 946 F.2d 1160, 1169 (5th Cir. 1991).

defendant involve co-defendants liable under the same legal theory.[54] But Caffesse and the University are not joint tortfeasors, and these cases involve set-offs for liability, not attorney's fees. Even if we were to extend this principle to claims for attorney's fees,[55] a set-off would only be justified where the non-settling party demonstrates that it was required to pay for legal work attributable to the settling party. As we have already noted, the University has not made such a showing. The district court's fee award was not an abuse of discretion.

V

---

[54] *See*, *e.g.*, *McDermott, Inc. v. Amclyde & River Don Castings, Ltd.*, 511 U.S. 202, 208 (1994) (stating that only when "a plaintiff settles with one of several joint tortfeasors [are] the nonsettling defendants . . . entitled to a credit for that settlement").

[55] The University cites *Ochoa v. Employers Nat'l Ins. Co.*, 724 F.2d 1171, 1178 (5th Cir. 1984), in which this Court applied the principle of double recovery to the allocation of attorney's fees in a suit for benefits under the Longshoreman's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901-950 (1976). We observed that district courts have discretion to adjust an attorney's fee to allow an injured longshoreman to share in the recovery. We also held that the court's allocation should not allow double recovery where the attorney has already obtained a fee for securing compensation benefits. *See id.* The Supreme Court subsequently vacated the panel opinion. *See* 469 U.S. 1082 (1984). On remand, we reaffirmed the approach adopted in the original opinion. *See Ochoa v. Employers Nat'l Ins. Co.*, 754 F.2d 1196, 1199 (5th Cir. 1985). This case does not, however, compel the award of a set-off based on a prior settlement involving a different party under different legal theories. Moreover, the University fails to indicate how much of the settlement allegedly compensated Mota's attorneys. Nor does the University specify the corresponding level of the settlement credit it seeks.

33

The University challenges the court's award of costs to Mota. An award of costs is reviewed for abuse of discretion.[56] The University contends that the district court erred in awarding $3,470.00 for videotaped depositions, $150.46 for an investigation of Caffesse, and a $1,500.00 mediation fee.[57]

Under 28 U.S.C. § 1920, a court may tax the following costs: fees of the clerk and marshal; fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case; fees and disbursements for printing and witnesses; fees for exemplification and copies of papers necessarily obtained for use in the case; docket fees; compensation of court-appointed experts, interpreters, and special interpretation services.[58] The Supreme Court has indicated that federal courts may only award those costs articulated in section 1920 absent explicit statutory or contractual authorization to the contrary.[59]

In Title VII cases, a district court has an additional source of authority for applying attorney's fees and costs, 42 U.S.C. § 2000e-5(k). This provision empowers the court to "allow the

---

[56] *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

[57] This figure reflects only the fee charged by the mediator, and not the attorney's fees incurred through the attempted mediation of this case.

[58] 28 U.S.C. § 1920 (2001).

[59] *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 444-45 (1987); *see also Denny v. Westfield State College*, 880 F.2d 1465, 1467-69 (1st Cir. 1989).

prevailing party . . . a reasonable attorney's fee as part of the costs."[60] This Court has interpreted the "attorney's fee" allowed by Section 2000e-5(k) to include "reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services," such as postage, photocopying, paralegal services, long distance telephone charges, and travel costs.[61]

The court erred in taxing the University with the cost of videotaped depositions. We have observed that "28 U.S.C. § 1920(2) only allows for the recovery of '[f]ees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case.' There is no provision for videotapes of depositions."[62] This reading is consistent with the text of 28

---

[60] 42 U.S.C. § 2000e-5(k) (2001).

[61] *Mennor v. Fort Hood Nat'l Bank*, 829 F.2d 553, 557 (5th Cir. 1987); *see also Associated Builders & Contractors of Louisiana, Inc. v. Orleans Parish Sch. Bd.*, 919 F.2d 374, 380 (5th Cir. 1990). In 1993 Rule 54(d)(2) of the Federal Rules of Civil Procedure was amended to outline procedures for filing claims for "attorney's fees and related non-taxable expenses." Fed. R. Civ. P. 54(d)(2) (2001). The provision in question applies "to requests for reimbursement of expenses, not taxable as costs, *when recoverable under governing law* incident to the award of fees." Fed. R. Civ. P. 54(d)(2) (advisory committee notes) (emphasis added). The rule change therefore does not and could not expand the scope of expenses recoverable as incidental to the award of fees. The governing substantive law dictates recoverable expenses.

[62] *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1049 (5th Cir. 1998). *But see Morrison v. Reichhold Chems., Inc.*, 97 F.3d 460 (11th Cir. 1996) (finding videotape deposition to be taxable, given section 1920 and Fed. R. Civ. P. 30(b)(4) and usefulness as a discovery technique); *Commercial Credit Equip. Corp. v. Stamps*, 920

35

U.S.C. § 1920(2) and the Supreme Court's admonition that we strictly construe this provision.[63] Nor is it feasible to characterize videotaped depositions as "out-of-pocket expenses" similar to postage and long-distance telephone calls.[64] Section 2000e-5(k) therefore lends no support for the court's ruling. As the court abused its discretion, we are compelled to vacate its award of the costs associated with videotaped depositions.

While the court also erred in taxing the University with the costs of mediation, its award of investigation costs was not an abuse of discretion. Neither category of expenses is within section 1920. We find that section 2000e-5(k) supports the award of investigation fees as a "reasonable out-of-pocket expense."[65] However, mediation costs do not fall within the limited category of expenses taxable under Title VII. In sum, we conclude that the district court abused its discretion in awarding the cost of videotaped depositions and mediation.

VI

F.2d 1361, 1367-69 (7th Cir. 1990) (same).

[63] *See Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441-42 (1987).

[64] 42 U.S.C. § 2000e-5(k); *see Mennor*, 829 F.2d at 556-57. Although *Migis*, 135 F.3d at 1048, addressed costs awarded in a Title VII case, it did not discuss the relevance of section 2000e-5(k) to this award.

[65] *See Hertz Corp. v. Caulfield*, 796 F. Supp. 225, 230 (E.D. La. 1992).

We AFFIRM the district court's judgment on Mota's claims of sexual harassment and retaliation and its award of investigation costs. We VACATE the award of the costs of videotaped depositions and mediation.

AFFIRMED in part, VACATED in part, and REMANDED.