# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1970

_____

Julie Weger; Mary Meghan Murphy,     *
                                   *

        Plaintiffs - Appellants,     *

                                     *    Appeal from the United States
    v.                              *    District Court for the
                                     *    Eastern District of Missouri.

City of Ladue; William Baldwin;     *
Donald Wickenhauser,           *
                                     *

        Defendants - Appellees.     *

_____

Submitted: January 11, 2007
Filed: September 13, 2007

_____

Before LOKEN, Chief Judge, BYE, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Julie Weger and Mary Meghan Murphy (collectively Plaintiffs) appeal the district court's[1] grant of summary judgment to their employer, the City of Ladue, on their claims of sexual harassment and retaliation under Title VII of the Civil Rights

_____

[1]The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17, and the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. §§ 213.010-.137.[2] We affirm.

I.

We present the facts in a light most favorable to the nonmoving parties, the Plaintiffs. See E.E.O.C. v. Wal-Mart Stores, Inc., 477 F.3d 561, 563 (8th Cir. 2007).

Plaintiffs were hired by the City of Ladue Police Department ("Department") as communications officers in 1999 and have been continuously employed by the Department since that time. During Weger's application process, Captain William Baldwin, then a lieutenant, learned that Weger had undergone breast reduction surgery and informed Sergeant John Wagner, then a detective. Wagner communicated this fact to Lieutenant Chris Baker, then a detective. In addition, during Murphy's application process, Baldwin commented to Wagner and Baker something to the effect that, though Murphy was not attractive, she had large breasts. Following their hire, Wagner informed the Plaintiffs of Baldwin's remarks. Eventually, the fact of Weger's prior surgical procedure became well known throughout the Department, resulting in Weger being subjected to teasing by her coworkers.

Plaintiffs work in the communications department, which consists of six dispatchers and one civilian supervisor. In 2000, Baldwin became the uniformed supervisor for the communications department. Baldwin also served as the Department's internal affairs investigator and second in command to Chief of Police Donald Wickenhauser, Baldwin's longtime friend. While serving as Plaintiffs' supervisor, Baldwin worked weekdays from 7 a.m. to 4 p.m., and Plaintiffs worked

---

[2]In the district court, Plaintiffs also asserted that Captain William Baldwin and Chief of Police Donald Wickenhauser sexually harassed and retaliated against them under 42 U.S.C. § 1983 in violation of the Fourteenth Amendment. The district court granted summary judgment on these claims, and Plaintiffs do not challenge this ruling.

rotating schedules such that they worked roughly the same hours as Baldwin only one month every six months. However, Plaintiffs often encountered Baldwin as they were coming on to their shifts and he was leaving and vice versa. From the commencement of Baldwin's assignment as Plaintiffs' supervisor, Baldwin sexually harassed the Plaintiffs, even though they continually expressed to Baldwin that they considered his conduct to be unwelcome and inappropriate.[3] As of the fall of 2001, Baldwin engaged in daily harassment of the Plaintiffs.

In the winter of 2001, Detective Norman witnessed an incident where Baldwin put his arm around Murphy's shoulder and leaned in close to her face, and Murphy stood up and stated, "I can't stand him." At an unspecified time, Officer Bonney saw Baldwin come up behind Murphy, who was standing in the communications area, and place his hands on her hips in an attempt to tickle her, Murphy became angry and told Baldwin to stop, Baldwin let go but followed Murphy with outstretched hands as if he was going to tickle her again, and Murphy told Baldwin to leave her alone. Also, at an unspecified time, Detective Lucas saw Baldwin moving his hands on Weger's shoulders and then saw Weger roll her eyes. Finally, in September 2002, Officer Bonney and Sgt. Wagner saw Murphy walking down the hallway with Baldwin behind her, he was rubbing her shoulders, she grimaced and turned away from Baldwin in an effort to break his grip on her shoulders, and, in response, Wagner shook his head and said "I can't believe that."

---

[3]Baldwin's harassing behavior toward the Plaintiffs included: (1) chasing them, tickling them, and blocking doorways so that they were unable to get around him; (2) massaging their shoulders, neck, and upper chest area underneath their uniforms; (3) attempting to hold their hands; (4) grabbing their waists; (5) running his fingers through their hair; (6) hugging them and pressing his body against their bodies; and (7) going under their desks in order to massage their legs. In addition, Baldwin made inappropriate sexual comments to Plaintiffs, including references to Murphy's breasts and legs and repeated inquiries into her sexual relations as well as remarks about the physical appearance of other women.

At the inception of Plaintiffs' employment with the Department, they received and reviewed a copy of its antiharassment policy. This policy specifically prohibits sexual harassment and outlines a complaint procedure for employees who believe they are being harassed or those that witness harassment of other employees. The policy requires supervisors to: (1) monitor the Department's work environment for any signs of harassment on a daily basis; (2) advise employees about the types of behavior prohibited and complaint procedures; (3) stop all observed acts of harassment regardless of whether the employees involved are under his or her supervision; and (4) take immediate action to limit the work contact between employees involved in a complaint of harassment pending investigation. Moreover, all Department employees are required to report observed acts of harassment to a supervisor and failure to do so is grounds for discipline. The policy also provides a comprehensive complaint procedure with multiple avenues to report harassment, including any supervisor, the Chief of Police, and the Mayor of Ladue. Upon receipt of a harassment complaint, the policy's procedure provides that the Department will immediately limit work contact between the alleged harasser and the complainant, and the Chief of Police is responsible for the investigation of the complaint. Finally, the policy prohibits retaliation against complainants and those participating in complaint investigations.

On November 5, 2002, Murphy encountered Baldwin in the kitchenette area adjacent to the communications area. Murphy had been out from work the day before because she had two teeth extracted, and she and Baldwin were discussing that procedure. Murphy described what happened next:

> [A]s I was standing there conversing with him, [Baldwin] approached me with his hands very close . . . attempting to cup my face and asked if . . . it hurt. He actually brushed my face. I did [not] know if he was going to kiss me or hug me or what. It made me feel very uncomfortable. At that point in time, I had had it.

Murphy then went immediately upstairs to Lt. Baker's office and reported the incident as well as previous instances of Baldwin's harassment. This was the first time that Murphy informed any Department supervisor that she was being sexually harassed by Baldwin. Baldwin's harassment of the Plaintiffs ended that day.

Baker reported Murphy's complaint to Chief Wickenhauser the following day, November 6th. Wickenhauser interviewed Murphy that day, and, along with describing the incident that had given rise to her complaint, she discussed Baldwin's prior harassment. After the interview, Wickenhauser contacted Baldwin and instructed him not to enter the communications area or have contact with any communications personnel until further notice. Wickenhauser then began an investigation of Murphy's complaint.

Wickenhauser's investigation consisted of interviewing Baldwin, Wagner, and Baker as well as Lieutenant Richard Wooten, Detective Chris Schmitz, Det. Norman, and Officer Richard Bonney. Wickenhauser informed some of the interviewees that they should consider retaining an attorney because Baldwin could sue them for slander. Several of the interviewees reported having witnessed Baldwin acting inappropriately toward four female employees: Murphy, Weger, Kristin Goin, a communications officer, and Pat Allison, who had served as the civilian supervisor for the communications department since 2001. In addition, Wagner, Schmitz, and Norman reported hearing other unnamed employees refer to Baldwin as "Captain Tickles" and "Tickle Me Elmo," which they believed grew out of his propensity for tickling females employees. Wickenhauser, Baker, and Wooten stated that they were not aware of Baldwin's nicknames.

Wickenhauser also interviewed all communications personnel. Allison and Goin denied that Baldwin had harassed them; however, Weger substantiated Murphy's claims, informing Wickenhauser that Baldwin tried to hug her and had touched or rubbed her shoulders, neck, and arms on many occasions. Weger joined Murphy in

-5-

her complaint. With regard to Baldwin's nicknames, Allison and Weger were not aware of them. However, Murphy had heard Department employees refer to Baldwin as "Captain Tickles" and "Tickle Me Elmo" intermittently.

About two weeks later, on November 19th, Wickenhauser completed his investigation, finding that Baldwin had not unlawfully sexually harassed Murphy or Weger. Rather, Wickenhauser determined that Baldwin touched the shoulders and arms of both male and female employees in a nonsexual manner when engaging in conversation with them, and that, though the touching was meant to be nonsexual, Murphy and Weger found it offensive. Although Wickenhauser refused to provide Plaintiffs with the results of his investigation, he shared this information with Baldwin, including the names and statements of the witnesses. Additionally, Wickenhauser issued a memorandum to Baldwin providing that: (1) though Baldwin had not engaged in unlawful harassment, the aforementioned touching offended some individuals; (2) the touching violated the Department's antiharassment policy; (3) Baldwin should, in the future, refrain from touching any Department employee; and (4) any future substantiated accounts of Baldwin's violation of the policy or retaliation against Plaintiffs or anyone involved in the investigation would result in his termination. Additionally, Baldwin was permanently removed as Plaintiffs' supervisor but remained their superior within the Department as he remained head of internal affairs and continued to serve as acting chief when necessary.

On November 21st, two days after the investigation ended, Wickenhauser issued directives to the entire Department, which he characterized as "safeguards," as a result of his investigation. These directives provided that: (1) not more than two detectives could eat lunch together; (2) when leaving the Department, detectives must call out their locations on the radio; (3) officers were no longer allowed to enter the communications area for any reason other than a business purpose; (4) a number of items that were normally located in the main work space of the communications area were moved to the kitchenette area in the rear, so officers could access those items

from the back, decreasing traffic through the main work area; and (5) the communications officers were no longer allowed to take breaks in the detective bureau. Plaintiffs felt that the directives were in retaliation for their harassment complaint and were meant to isolate them by making it difficult for them to interact with their coworkers for both social and work-related purposes.

Plaintiffs also felt ostracized by officers, who acted indifferent towards them, and Chief Wickenhauser, who ignored them. Moreover, Baldwin's continued presence in the communications area, though for work-related reasons, made the Plaintiffs feel uncomfortable because they believed that Baldwin did this in order to indicate his superior position. In addition, Allison began taking more detailed notes of Plaintiffs' work activities. Although Allison's notes with regard to Murphy's activities amounted to only a page and a half in the seventeen months prior to her complaint, Allison took seven pages of notes relating to Murphy's activities in the twelve months following her complaint. On the whole, Allison's notes concerning Plaintiffs' postcomplaint work activities record both positive and negative events as well as Plaintiffs' sick days and requests for leave.

In 2003, the Department, for the first time since Plaintiffs were hired, reinstituted a policy requiring annual written evaluations for all communications officers. On March 5, 2003, about four months after Plaintiffs' complaint, Weger underwent her first performance review, receiving the highest possible marks in all but two categories, quality of work and personal relations, for which she earned above standard and standard marks, respectively. It appears that Murphy did not undergo her first performance review until March 5, 2004, about sixteen months after Plaintiffs' complaint. Murphy received above standard ratings in all but two categories, reporting habits and personal contacts, for which she received standard and needs improvement ratings, respectively.

Plaintiffs brought their charges of sexual harassment and retaliation to the Equal Employment Opportunity Commission ("EEOC"). The EEOC found sufficient evidence to support Plaintiffs' sexual harassment claim, but not their retaliation claim, and directed the parties to begin settlement negotiations. The matter was not resolved, and, after exhausting their administrative remedies, Plaintiffs filed a twelve count complaint against the City of Ladue, Capt. Baldwin, and Chief Wickenhauser on June 2, 2004, alleging hostile work environment sexual harassment and retaliation under Title VII, the MHRA, and 42 U.S.C. § 1983 in violation of the Fourteenth Amendment. By an order dated December 30, 2004, the district court dismissed Plaintiffs' MHRA claims against Baldwin and Wickenhauser, in their individual capacities, finding Plaintiffs had failed to state a claim against them as a matter of law.

On June 1, 2005, the Defendants moved for summary judgment on the Plaintiffs' remaining claims. The district court granted the motion and dismissed all of the Plaintiffs' claims, finding that: (1) the hostile work environment sexual harassment claims failed because, assuming Plaintiffs demonstrated a prima facie case, the Defendants established the affirmative defense announced by the Supreme Court in Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775 (1998) ("Ellerth-Faragher affirmative defense") as a matter of law,[4] and (2) the retaliation claims failed because Plaintiffs could not make

---

[4]Because Plaintiffs' hostile work environment sexual harassment claims pursuant to Title VII, the MHRA, and section 1983 claims are subject to the same analysis, see LeGrand v. Area Res. for Cmty. & Human Servs., 394 F.3d 1098, 1101 (8th Cir.), cert. denied, 126 S. Ct. 335 (2005) (Title VII and MHRA claims analyzed under same standards); Wright v. Rolette County, 417 F.3d 879, 884 (8th Cir.), cert. denied, 126 S. Ct. 1338 (2006) (Title VII and section 1983 claims analyzed under same standards), the district court's finding resulted in the dismissal of all of the Plaintiffs' hostile work environment claims.

out a prima facie case where there had not shown that they underwent an adverse employment action.[5]

Plaintiffs appeal only the grant of summary judgment to the City of Ladue, contending that genuine issues of fact preclude the application of the Ellerth-Faragher affirmative defense and that they have demonstrated a prima facie case of retaliation.

II.

We review de novo the district court's grant of summary judgment to the City of Ladue, viewing the evidence and drawing all reasonable inferences in the light most favorable to the Plaintiffs, and will affirm the judgment if there is no genuine issue of material fact and the City is entitled to judgment as a matter of law. See Carrington v. City of Des Moines, Iowa, 481 F.3d 1046, 1050 (8th Cir. 2007).

Title VII prohibits employers from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). "Discrimination based on sex that creates a hostile or abusive working environment violates Title VII." Nitsche v. CEO of Osage Valley Elec. Coop., 446 F.3d 841, 845 (8th Cir. 2006) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). In order to make a prima facie showing of hostile work environment based on supervisor sexual harassment, Plaintiffs must show that: (1) they belong to a protected group; (2) they were subject to Baldwin's unwelcome harassment; (3) a causal nexus exists

_____

[5]As previously noted, Title VII and the MHRA are subject to the same analysis. See LeGrand, 394 F.3d at 1101. Thus, the district court dismissed all of Plaintiffs' retaliation claims for this reason. The district court also dismissed the Plaintiffs' section 1983 claims, finding that they had failed to state a cause of action under the Equal Protection Clause of the Fourteenth Amendment.

between the harassment and their protected group status; and (4) Baldwin's harassment affected a term, condition, or privilege of their employment. Gordon v. Shafer Contracting Co., Inc., 469 F.3d 1191, 1194-95 (8th Cir. 2006). For purposes of the summary judgment motion, the district court found that Plaintiffs had met the first three elements and assumed the final element such that Plaintiffs demonstrated a prima facie case of hostile work environment sexual harassment. However, the district court granted summary judgment to the City of Ladue based on the Ellerth-Faragher affirmative defense. Thus, we consider only whether the City proved the affirmative defense as a matter of law.

A.

Because the hostile work environment sexual harassment that Plaintiffs were subjected to in this case was perpetrated by a supervisor, the City is vicariously liable for the harassment unless it demonstrates its entitlement to the Ellerth-Faragher affirmative defense, which is potentially applicable in situations where, as here, no tangible employment action is alleged. See Williams v. Mo. Dept. of Mental Health, 407 F.3d 972, 975-76 (8th Cir.), cert. denied, 126 S. Ct. 1037 (2006) (citing Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807-08). The Ellerth-Faragher affirmative defense consists of "two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior[] and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Id. at 976 (quoting Faragher, 524 U.S. at 807).

Despite Plaintiffs' admission that they were aware of the Department's antiharassment policy throughout the period of Baldwin's harassment and that the harassment came to an end on the day Murphy filed her complaint, Plaintiffs contend that genuine issues of material fact exist as to whether the Department satisfied the Ellerth-Faragher affirmative defense because: (1) the Department's antiharassment

-10-

policy was ineffective; (2) the Department had both actual and constructive notice of the harassment before Murphy's complaint due to a supervisor and employees observing instances of harassment over the preceding two years; (3) the Department's corrective actions were harsh and skewed in favor of Baldwin; and (4) the Plaintiffs did not unreasonably delay in invoking the Department's complaint procedure because they possessed credible fears of retaliation and believed that Chief Wickenhauser would not conduct a fair investigation of the matter because of his close relationship with Baldwin. We address each of Plaintiffs' claims in turn.

1.

The first element of the affirmative defense imposes two requirements on employers, they must have (1) exercised reasonable care to prevent sexual harassment (the "prevention prong") and (2) promptly corrected any sexual harassment that did occur (the "correction prong"). Faragher, 524 U.S. at 807; see Phillips v. Taco Bell Corp., 156 F.3d 884, 889 (8th Cir. 1998) (examining both an employer's prevention efforts and response to a harassment complaint in determining whether the employer satisfied the first element of the defense); see also Cerros v. Steel Techs., Inc., 398 F.3d 944, 953 (7th Cir. 2005) ("The mere existence of [an antiharassment] policy . . . does not necessarily establish that the employer acted reasonably in remedying the harassment after it has occurred . . . ."); Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1314 (11th Cir. 2001) ("The first element of the . . . affirmative defense requires that an employer demonstrate that it took reasonable care both to prevent *and* correct harassment."); Spriggs v. Diamond Auto Glass, 242 F.3d 179, 188 (4th Cir. 2001) ("Under these circumstances, a jury could rationally conclude that, although [the employer's] institution of an [antiharassment] policy represented a reasonable step toward preventing the type of abuse suffered by [the employee], the company unreasonably failed to correct [the harasser's] offending behavior . . . ."); Shaw v. Autozone, Inc., 180 F.3d 806, 812 (7th Cir. 1999) ("The first prong of the . . . defense

-11-

also requires [an employer] to prove that it exercised reasonable care to respond to the sexual harassment.").

The prevention prong is meant to further "Title VII's deterrent purpose," <u>see</u> <u>Ellerth</u>, 524 U.S. at 764, by "recogniz[ing] the employer's affirmative obligation to prevent violations and giv[ing] credit . . . to employers who make reasonable efforts to discharge their duty." <u>Faragher</u>, 524 U.S. at 806; <u>see</u> <u>Ellerth</u>, 524 U.S. at 764 ("Title VII is designed to encourage the creation of antiharassment policies and effective grievance procedures."). Though the Department's distribution of a valid antiharassment policy provides "'compelling proof' that [it] exercised reasonable care in preventing and promptly correcting sexual harassment," <u>see</u> <u>Barrett v. Applied</u> <u>Radiant Energy Corp.</u>, 240 F.3d 262, 266 (4th Cir. 2001), it is not dispositive.

We have found a sexual harassment policy insufficient because it did not require supervisors, who are notified of an employee being sexually harassed, to report that information to those in a position to take corrective action. <u>See</u> <u>Varner v.</u> <u>Nat'l Super Mkts., Inc.</u>, 94 F.3d 1209, 1213-14 (8th Cir.), <u>cert. denied</u>, 519 U.S. 1110 (1997). However, we have held that an employer exercised reasonable care to prevent harassment where it distributed its antiharassment policy to all of its employees, and the policy's complaint procedure "identifie[d] three company officials to whom harassment [could be] reported." <u>Gordon</u>, 469 F.3d at 1195; <u>see</u> <u>Williams</u>, 407 F.3d at 976-77 (finding that an employer's antiharassment policy, with a nonretaliation provision and a flexible reporting procedure, satisfies the employer's duty under the prevention prong).

Plaintiffs contend that the Department did not satisfy the prevention prong because its antiharassment policy was ineffective in the following ways: (1) Plaintiffs' coworkers and supervisors did not report observed acts of Baldwin's harassment of Plaintiffs; (2) the Department did not offer training or counseling with regard to sexual harassment; and (3) the Department made no attempt to monitor Baldwin's

behavior. However, Plaintiffs have offered no authority from this court that these failures render the Department's harassment prevention efforts unreasonable. Moreover, the policy at issue is distinguishable from Varner and analogous to Gordon and Williams because the Department's policy, which was provided to all employees, identifies multiple officials to whom harassment may be reported and contains an antiretaliation provision. Furthermore, Plaintiffs have not alleged that their delay in invoking the Department's complaint procedure was, in any way, a result of the policy's deficiencies. On the contrary, Plaintiffs chose not to invoke the Department's complaint procedure for at least a year due to their fears of retaliation and that they would not receive a fair investigation, which goes to the second element of the Ellerth-Faragher affirmative defense.

In sum, we find that the Department acted reasonably to prevent harassment as a matter of law because it had a facially valid antiharassment policy that, when invoked by Plaintiffs, brought an immediate end to Baldwin's harassment. Thus, the City of Ladue has satisfied the prevention prong of the first element of the Ellerth-Faragher affirmative defense as a matter of law.

2.

Plaintiffs also contend that the Department has not satisfied the correction prong as a matter of law because: (1) it had both actual and constructive notice of Baldwin's harassment via its employees observation of the harassment prior to Murphy's complaint; (2) its investigation of Plaintiffs' complaint was flawed; and (3) its remedial action was harsh and skewed in favor of Baldwin.

The correction prong requires the Department to demonstrate that it "exercised reasonable care . . . to correct promptly any sexually harassing behavior." Faragher, 524 U.S. at 807. Therefore, in applying the correction prong, "the employer's notice of the harassment is of paramount importance . . . ." Madray v. Publix Supermarkets,

Inc., 208 F.3d 1290, 1299 (11th Cir. 2000) (quoting Dees v. Johnson Controls World Servs., 168 F.3d 417, 422 (11th Cir. 1999)); see Stuart v. General Motors Corp., 217 F.3d 621, 633 (8th Cir. 2000) ("Factors the [c]ourt may consider when assessing the reasonableness of [an employer's] remedial measures include the amount of time elapsed between the notice of harassment, which includes but is not limited to a complaint of sexual harassment, and the remedial action . . . ."); see also Swenson v. Potter, 271 F.3d 1184, 1192 (9th Cir. 2001) ("Notice of the sexually harassing conduct triggers an employer's duty to take prompt corrective action that is reasonably calculated to end the harassment.") (internal quotation marks omitted). Therefore, we must determine when the Department had notice of Baldwin's harassing behavior in order to evaluate the promptness of its response.

Plaintiffs assert that the Department had actual notice of Baldwin's harassment prior to November 5, 2002, because at least one supervisor, who was designated to receive harassment complaints under the Department's policy, observed the harassment. Plaintiffs further contend that, because the policy required employees who observed harassment to report it, their coworkers' observation of Baldwin's harassment also constituted actual notice to the Department prior to Murphy's complaint. However, where an employer has a complaint procedure delineating the individuals to whom notice of harassment must be given, employee observations are not relevant to the actual notice inquiry. See Watson v. Blue Circle, Inc., 324 F.3d 1252, 1259 (11th Cir. 2003) ("When an employer has a clear and published policy that outlines the procedures an employee must follow to report suspected harassment and the complaining employee follows those procedures, actual notice is established. Constructive notice, on the other hand, is established when the harassment was so severe and pervasive that management reasonably should have known of it.") (citation omitted); Minix v. Jeld-Wen, Inc., No. 06-16094, 2007 WL 1828259, at *2 (11th Cir. June 27, 2007) (per curiam) (unpublished) (finding "dispositive" the fact that the employee did not report harassment to an individual designated to receive such

complaints by the employer's antiharassment policy so that the employer did not have actual notice of the harassment).

Rather, because the Department has a published policy that provides a procedure for reporting suspected harassment, Plaintiffs must have invoked this procedure in order to establish actual notice. See Watson, 324 F.3d at 1259; see also Minix, 2007 WL 1828259, at *2 ("[O]nce an [antiharassment] policy has been effectively disseminated to an employer's employees 'it is incumbent upon the employees to utilize the procedural mechanisms established by the company specifically to address the problems and grievances.'") (quoting Madray, 208 F.3d at 1298-99). Prior to Murphy's complaint to Lt. Baker on November 5, 2002, which provided actual notice to the Department, Murphy admits that she failed to inform any Department supervisor or any other individual designated by the policy that she was being sexually harassed by Baldwin. Because the record is devoid of any indication that Plaintiffs invoked the Department's harassment complaint procedure prior to Murphy's complaint, the Department did not have actual notice of Baldwin's harassment until November 5, 2002.

Plaintiffs also assert that the Department's correction of Baldwin's harassment was not reasonably prompt because the Department had constructive notice of such harassment prior to Murphy's complaint via supervisor and coworker observation of Baldwin's inappropriate conduct.[6] An employee can show an employer's constructive

_____

[6]This assumes without deciding that the constructive knowledge doctrine is relevant in evaluating the promptness of an employer's correction efforts pursuant to the first element of the Ellerth-Faragher affirmative defense. See Griffin v. Pinkerton's Inc., 173 F.3d 661, 665 (8th Cir. 1999) (acknowledging that an employer may be charged with "constructive knowledge of a racially hostile environment"); Smith v. St. Louis Univ., 109 F.3d 1261, 1265 n.3 (8th Cir. 1997) (noting that a victim of harassment "may be able to demonstrate that the [employer] had constructive notice . . . before [the victim's] initial complaint provided actual notice"); see also Kunin v. Sears Roebuck & Co., 175 F.3d 289, 294 (3d Cir. 1999) (recognizing that the potential

knowledge of sexual harassment by demonstrating that "the harassment was so severe and pervasive that management reasonably should have known of it." Watson, 324 F.3d at 1259; see Smith v. St. Louis Univ., 109 F.3d 1261, 1265 n.3 (8th Cir. 1997) (recognizing that constructive notice of harassment exists where "the harassment was obvious to everyone"); see also Taylor v. Jones, 653 F.2d 1193, 1199 (8th Cir. 1981) (affirming the district court's finding that "the atmosphere of racial discrimination and of prejudice was so pervasive and so long continuing . . . that the employer must have become conscious of it").

The district court considered the following six instances in determining whether constructive notice, prior to Murphy's complaint, should be imputed to the Department: (1) Baldwin's comment to Sgt. Wagner with regard to Weger's breast reduction surgery in February 1999; (2) Baldwin's remark to Sgt. Wagner and Lt. Baker with regard to Murphy's appearance in October 1999; (3) the incident witnessed by Det. Norman in the winter of 2001, which ended with Murphy stating that she could not "stand" Baldwin; (4) Officer Bonney's observation of Baldwin touching Murphy and attempting to tickle her after she told him to stop where Murphy eventually told Baldwin to leave her alone; (5) Det. Lucas's observation of Baldwin touching Weger's shoulders and Weger rolling her eyes; and (6) the September 2002

for constructive notice in the context of sexual harassment claims "strike[s] the correct balance between protecting the rights of the employee and the employer by faulting the employer for turning a blind eye to overt signs of harassment but not requiring it to attain a level of omniscience, in the absence of actual notice, about all misconduct that may occur in the workplace"). But see Farley v. Am. Cast Iron Pipe Co., 115 F.3d 1548, 1554 (11th Cir. 1997) ("[A]n employer is insulated from liability under Title VII for a hostile work environment sexual harassment claim premised on constructive knowledge of the harassment when the employer has adopted an anti-discrimination policy that is comprehensive, well-known to employees, vigorously enforced, and provides alternate means of redress."); Minix v. Jeld-Wen, Inc., No. 06-16094, 2007 WL 1828259, at *3-4 (11th Cir. June 27, 2007) (per curiam) (unpublished) (applying the Farley rule).

incident where Officer Bonney and Sgt. Wagner saw Baldwin rubbing Murphy's shoulders and Murphy grimaced and turned away from Baldwin.

The district court found, as a matter of law, that these instances did not impute constructive notice to the Department that Baldwin was sexually harassing the Plaintiffs because they occurred over a substantial period of time and no single officer observed more than three incidents. Though the behavior attributed to Baldwin is reprehensible, the six instances observed by Department employees lack the requisite pervasiveness to support a finding that it "was obvious to everyone." See Smith, 109 F.3d at 1265 n.3. Therefore, as a matter of law, constructive knowledge that Baldwin was sexually harassing the Plaintiffs cannot be imputed to the Department before it received actual notice via Murphy's complaint on November 5, 2002. Accordingly, the district court properly evaluated the promptness of the Department's efforts to correct Baldwin's harassment from that date. See Robinson v. Valmont Indus., 238 F.3d 1045, 1047 (8th Cir. 2001) ("When assessing the reasonableness of an employer's remedial actions, the court may consider the amount of time that elapsed between the notice of the harassment and the remedial measures taken . . . ."). Because the harassment ended that day, the Department satisfied its duty under the correction prong of the first element of the Ellerth-Faragher affirmative defense. See Whitmore v. O'Connor Mgmt., Inc., 156 F.3d 796, 800 (8th Cir. 1998) (affirming grant of summary judgment to an employer on hostile work environment sexual harassment claim where "an explicit communication to . . . management of [employee's] complaints brought a prompt and appropriate remedial response").

Finally, Plaintiffs contend, despite the fact that Baldwin's harassment ended the day of Murphy's complaint, that the Department failed to satisfy the correction prong because its investigation of Murphy's complaint was flawed and its remedial action was harsh and skewed in favor of Baldwin. Generally, where the employer responds to a sexual harassment complaint in such a way as to promptly stop the sexual harassment, there is no basis for finding employer's postcomplaint actions not

-17-

sufficiently corrective.  See Walton v. Johnson & Johnson Servs., Inc., 347 F.3d 1272, 1288 (11th Cir. 2003) ("[W]here the substantive measures taken by the employer are sufficient to address the harassing behavior, complaints about the process under which those measures are adopted ring hollow."); Farley v. Am. Cast Iron Pipe Co., 115 F.3d 1548, 1555 (11th Cir. 1997) ("Although [an employee] remains unsatisfied with [her employer's] resolution of her complaint, we have never stated . . . that a complainant in a discrimination action has a right to the remedy of her choice.").

Plaintiffs point to a number of defects in Wickenhauser's investigation, which were addressed by the district court, to establish the unreasonableness of the Department's corrective actions.  As the district court stated, "Wickenhauser found against the weight of the evidence, that Baldwin did not harass Murphy and Weger. In addition, he dealt harshly with witnesses who buttressed Plaintiffs['] claims, advising them that Baldwin could sue them for slander."  Furthermore, Wickenhauser compromised the confidential nature of the investigation by relaying the content of the interviewees' statements to Baldwin.  While the district court correctly characterized these "flaws" as "significant," they do not show that the Department failed to fulfill its duty under the correction prong, which seeks to ensure that once employers are alerted to harassment they act promptly to bring it to an end, because Baldwin's harassment undisputedly stopped the day that Murphy reported it.  Thus, the flaws in the Chief's investigation do not create a genuine issue of fact with regard to the correction prong.  Furthermore, Plaintiffs' attempt to analogize this case to Mota v. Univ. of Tex. Houston Health Sci. Ctr., 261 F.3d 512 (5th Cir. 2001) is not persuasive. There, the Fifth Circuit held that there was a genuine issue of fact as to whether the employer exercised reasonable care to promptly correct harassment because the employer had left it to the victim and the harasser to "work out a mutually agreeable accommodation" and failed to "issue a reprimand or warning" as it had in similar past situations.  Id. at 525.  Thus, the Department's postcomplaint response sufficiently distinguishes this case from Mota.

Plaintiffs also contend that the Department's postcomplaint actions do not satisfy the correction prong because they were harsh and skewed in Baldwin's favor. However, "[i]f an employer has . . . notice of harassment but takes immediate and appropriate corrective action, the employer is not liable for the harassment." Watson, 324 F.3d at 1261. Here, as our previous analysis established, the Department had notice of Baldwin's harassment on November 5, 2002. When Chief Wickenhauser became aware of Murphy's complaint the following day, he took immediate action to discuss the claims with Murphy, investigate them, and distance Baldwin from Plaintiffs by temporarily relieving him of his supervisory duties for the communications officers and instructing him not to enter the communications area unless in the company of another supervisor and for a work-related purpose. See Cerros, 398 F.3d at 954 (recognizing that "prompt investigation of the alleged misconduct [is] a hallmark of reasonable corrective action"). Moreover, at the conclusion of investigation, Wickenhauser permanently reassigned Baldwin so that he was no longer Plaintiffs' uniformed supervisor. See McCurdy v. Ark. State Police, 375 F.3d 762, 771 (8th Cir.), cert. denied, 543 U.S. 1121 (2005) (finding that employer took proper remedial action where it "immediately . . . insulate[d] [the alleged victim] from further offensive conduct"). Most significant, Baldwin's harassment ended the day the Department received notice of it. See Walton, 347 F.3d at 1288 ("Remedial measures should be designed to stop the harassment . . . and ensure that the harassment does not recur."); McKenzie v. Ill. Dep't of Transp., 92 F.3d 473, 481 (7th Cir. 1996) (finding no genuine issue of fact as to the correction prong where the prompt and remedial action taken by the employer was "completely effective").

Therefore, there is no genuine issue of fact with regard to the timeliness and adequacy of the Department's corrective actions. Thus, the district court correctly found that the City of Ladue acted reasonably to prevent and promptly correct sexually harassing behavior such that it has satisfied the first element of the Ellerth-Faragher affirmative defense as a matter of law.

B.

Plaintiffs also contend that the district court erred in finding that, as a matter of law, the Plaintiffs unreasonably delayed reporting Baldwin's harassment. In order to satisfy the second element of the Ellerth-Faragher affirmative defense, the Department must show that "the [Plaintiffs] unreasonably failed to take advantage of any preventative or corrective opportunities provided by the [Department] or to avoid harm otherwise." Williams, 407 F.3d at 976 (quoting Faragher, 524 U.S. at 807). Though "proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807-08. Though "[t]here is no bright-line rule as to when a failure to file a complaint becomes unreasonable," Reed v. MBNA Mktg. Sys., Inc., 333 F.3d 27, 35 (1st Cir. 2003), this court has previously found four months delay in invoking an employer's grievance procedure unreasonable. See Williams, 407 F.3d at 976-77; see also Walton, 347 F.3d at 1289-91 (finding two and one half months delay in invoking employer's antiharassment policy unreasonable).

Plaintiffs admit that they knew the Department's antiharassment policy was in effect at the inception of Baldwin's harassment and that they were to invoke the Department's complaint procedure the first time they were harassed. However, Murphy did not report the harassment for over a year, and Weger only did so when directly questioned about Baldwin's conduct toward her during Chief Wickenhauser's investigation. Therefore, absent some credible basis for Plaintiffs' admitted year long delay in reporting Baldwin's harassment, the City of Ladue has established the second element of the affirmative defense.

-20-

Plaintiffs contend that their delay was not unreasonable in light of their credible fears of retaliation and their belief that they would not receive a fair investigation due to Baldwin's and Wickenhauser's close relationship. We recognize "the enormous difficulties involved in lodging complaints about discrimination in the workplace, including sexual harassment," see Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1366 (11th Cir. 1999) (per curiam), specifically, "the great psychological burden it places on one who is already the victim of harassment to require that person to complicate further his or her life with the ramifications, both legal and otherwise, of making a complaint." Id. We further acknowledge that this burden is even greater where, as here, the victims of harassment perceive a bias in favor of their harasser on the part of the individual that will investigate their harassment complaint. However, as the First Circuit observed:

> Reporting sexually offensive conduct by a supervisor would for many or most employees be uncomfortable, scary or both. But because this will often or ordinarily be true, as the Supreme Court certainly knew, its regime necessarily requires the employee in normal circumstances to make this painful effort *if the employee wants to impose vicarious liability on the employer and collect damages under Title VII*. In short, for policy reasons representing a compromise, more than ordinary fear or embarrassment is needed.

Reed, 333 F.3d at 35 (citing Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 270 (4th Cir. 2001)). Thus, "an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty . . . to alert the employer to the allegedly hostile environment." Williams, 407 F.3d at 977 (quoting Shaw, 180 F.3d at 813). "The complaint mechanism, after all, can be used to address threats of retaliation as well as harassment . . . ." Reed, 333 F.3d at 36.

Accordingly, Plaintiffs must demonstrate a "truly credible threat of retaliation," see id., in order to render their delay reasonable. See Walton, 347 F.3d at 1290-91

-21-

("[A]bsent a credible threat of retaliation, [an employee's] subjective fears of reprisal do not excuse her failure to report [a supervisor's] alleged harassment."); Matvia, 259 F.3d at 270 (holding that a "nebulous fear" of retaliation is not an adequate basis for not reporting); Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 295 (2d Cir. 1999) (requiring a credible fear of retaliation to excuse employee's delay in reporting workplace harassment). For example, "general statements by a supervisor that a complaint will be futile or will get the employee in trouble cannot be an automatic excuse for failing to use the complaint mechanism." See Reed, 333 F.3d at 36; see also Walton, 347 F.3d at 1291 (finding that, where the allegedly harassing supervisor "never told [employee] that her job was in jeopardy, nor did he threaten her with physical harm," the employee "did not reasonably avail herself of the protections afforded by [her employer's antiharassment] policies").

In this case, because the record is devoid of any threat by any Department employee, Plaintiffs' fear of retaliation is not credible and, thus, does not excuse their year long delay in reporting Baldwin's harassment. Furthermore, the reasonableness of Plaintiffs' fears of retaliation is further called into question because the Department's antiharassment policy contained an antiretaliation provision. Additionally, Plaintiffs' concerns that they would not receive a fair investigation of their complaint due to Chief Wickenhauser's relationship with Baldwin are insufficient to excuse their delay. See Gordon, 469 F.3d at 1195 (finding insufficient to defeat summary judgment employee's belief that reporting harassment, in accordance with employer's antidiscrimination policy, would have been "ineffective"); Reed, 333 F.3d at 36 ("[C]oncerns as to whether the complaint mechanism will fail can be tested by trying it out if failure is the only cost."); Caridad, 191 F.3d at 295 ("[T]here are many reasons why a victimized employee may be reluctant to report acts of workplace harassment, but for that reluctance to preclude the employer's affirmative defense, it must be based on . . . [a] credible fear that her complaint would not be taken seriously.").

We, therefore, find Plaintiffs' unreasonably delayed reporting Baldwin's harassment, satisfying the second element of the affirmative defense as a matter of law. Because the preceding analysis established that the Department satisfied both the prevention and correction prongs of the first element, we affirm the judgment of the district court that the City of Ladue is entitled to the Ellerth-Faragher affirmative defense as a matter of law.

## III.

Plaintiffs contend the district court erred in finding that they had failed to make out a prima facie case of retaliation, specifically, that they did not establish an adverse employment action in light of an intervening Supreme Court case, Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. ___, 126 S. Ct. 2405 (2006). Though we recognize that the Supreme Court "broaden[ed] . . . the retaliation prima facie case" in Burlington Northern, for the reasons explained below, Plaintiffs' allegations remain inadequate. See Higgins v. Gonzales, 481 F.3d 578, 589 (8th Cir. 2007) (citing Burlington N., 126 S. Ct. at 2405).

In addition to proscribing sexual harassment in the workplace, Title VII prohibits retaliation against employees who allege, or participate in an investigation or proceeding alleging, a violation of Title VII by his or her employer. See 42 U.S.C. § 2000e-3(a); Burlington N., 126 S. Ct. at 2415. To make out a prima facie case of retaliation, Plaintiffs must show:  (1) they engaged in protected conduct; (2) reasonable employees would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct. See Burlington N., 126 S. Ct. at 2415; Higgins, 481 F.3d at 589 (citing Singletary v. Mo. Dept. of Corrs., 423 F.3d 886, 892 (8th Cir. 2005) (providing prior standard, which required an employee to show an adverse employment action to satisfy the second prong)).  The materially adverse action prong "is 'objective, requiring us to consider whether a reasonable employee in the plaintiff's position

-23-

might have been dissuaded from making a discrimination claim because of the employer's retaliatory actions.'" Carrington, 481 F.3d at 1050 (quoting Higgins, 481 F.3d at 589). Therefore, we must "separate significant from trivial harms" in order to determine whether Plaintiffs have satisfied this prong. See Burlington N., 126 S. Ct. at 2415.

Plaintiffs challenge a number of the Department's postcomplaint activities as materially adverse actions, including: (1) isolating them from their coworkers through Chief Wickenhauser's directives; (2) supervisor Allison "papering" their personnel files; (3) conducting performance evaluations of Plaintiffs for the first time; (4) ostracizing Plaintiffs; (5) failing to provide Murphy compensatory time equal to other communication officers; (6) failing to provide equitable overtime to Weger; and (7) removing Weger from her position as a training officer. We address each action in turn.

First, Chief Wickenhauser's directives were not materially adverse because they were issued to the Department as a whole, resulted in only minor changes in workplace procedure, and impacted the Plaintiffs in the same way as all other communications officers. Though the Plaintiffs contend that the directives were designed to isolate them from their coworkers, the directives did not, in any way, single out the Plaintiffs. It simply does not follow that an employer's announcement of a new policy that affects all or substantially all of its employees in the same manner would so adversely affect the Plaintiffs' lives that it would have dissuaded them from reporting Baldwin's harassment. See Higgins, 481 F.3d at 591. Moreover, Plaintiffs' attempt to analogize the isolation they felt as a result of the directives with the actionable retaliation in Moore v. KUKA Welding Sys. & Robot Corp., 171 F.3d 1073 (6th Cir. 1999) is not persuasive. In Moore, following the plaintiff's discrimination complaint, his employer "intentionally isolated" him from his coworkers by instructing "the other employees not to talk to him, go into his area or otherwise interact with him." Id. at 1080. On the contrary, to the extent that the directives in

this case resulted in Plaintiffs feeling isolated, they could feel no more isolated than any other communication officer because they were all affected in the same way by the directives.

Second, supervisor Allison's increased notetaking with regard to Plaintiffs' work activities does not satisfy Burlington Northern's materially adverse standard where the notes were largely positive or neutral and Plaintiffs have failed to raise any allegation as to how the inclusion of Allison's notes in their personnel files had any negative impact on their lives. See 126 S. Ct. at 2415. Absent such an allegation, we are unable to characterize "this as an *adverse* action, let alone a materially adverse one." See Higgins, 481 F.3d at 590. Moreover, Plaintiffs' reliance on Kim v. Nash Finch Co., 123 F.3d 1046 (8th Cir. 1997) is misplaced. There, this court used the term "papering" to refer to the employer's practice of filling the plaintiff-employee's personnel file with negative reports, some of which "involved petty and insignificant incidents," as well as two written reprimands. Id. at 1061. However, Allison's increased notetaking activities do not approach the kind of retaliatory activity in Kim because the Plaintiffs do not allege that the "papering" of their files included even a single reprimand and, in fact, it largely consisted of positive or neutral reports.

Third, the requirement that Plaintiffs receive performance evaluations, for the first time, following their harassment complaint is not materially adverse under Burlington Northern because, again, this policy applied to, and affected all, communications officers equally. Furthermore, the evaluations were not adverse where the Plaintiffs received primarily "superior" or "above standard" ratings, and neither asserted any negative impact from these evaluations. We also note that the first performance evaluation of either plaintiff took place on March 5, 2003, four months after Murphy's complaint. Though not dispositive, we have previously "held that an interval as brief as two months did not show causation for purposes of establishing a retaliation claim, . . . and that a two-week interval was sufficient, but

-25-

barely so . . . ." See Lewis v. St. Cloud State Univ., 467 F.3d 1133, 1138 (8th Cir. 2006) (internal quotation and citation omitted).

Fourth, the fact that Plaintiffs felt ostracized by Chief Wickenhauser and other officers falls short of Burlington Northern's materially adverse standard because Plaintiffs did not suffer significant harm. See 126 S. Ct. at 2415. The only specific instances of ostracism alleged by the Plaintiffs is Murphy's exclusion from several of the male police officers' "happy hours," which she had been invited to prior to her complaint; however, ostracism of this sort was specifically addressed and found lacking by the Burlington Northern Court. There, the Court instructed that "[a] supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." See id. at 2415-16. The "petty slights and snubs" Murphy experienced in being excluded from after work social activities, without facts showing how this exclusion "materially and adversely affected [her] life such that a reasonable employee in her shoes would be dissuaded from complaining," are akin to the sort of trivial harms that do not rise to the level of retaliation. See Higgins, 481 F.3d at 591. Furthermore, we cannot allow Plaintiffs' subjective feelings about being ostracized to steer our analysis because to do so would result in "the uncertainties and unfair discrepancies" the Supreme Court expressly sought to avoid in Burlington Northern. See 126 S. Ct. at 2415.

Finally, with regard to Plaintiffs' three remaining allegations, we need not examine whether they are sufficiently adverse to satisfy Burlington Northern because they all fail for lack of evidentiary support. See Fed. R. Civ. P. 56(e) (requiring Plaintiffs to "set forth specific facts showing there is a genuine issue for trial"); Robinette v. Jones, 476 F.3d 585, 591 (8th Cir. 2007) ("Without . . . facts to demonstrate that there is a genuine issue for trial, . . . mere allegations . . . cannot defeat summary judgment."). The Department's alleged failure to provide Murphy

with equitable compensatory time and Weger with equitable overtime as well as its alleged removal of Weger from her position as a training officer amount to nothing more than unsupported, conclusory allegations, which are insufficient to defeat a motion for summary judgment. See id. In short, Plaintiffs have not demonstrated a genuine issue of fact where they have not produced any evidence that the Department actually engaged in these acts. Moreover, because Weger admitted that she was not a training officer prior to her sexual harassment complaint, Plaintiffs' allegation connecting Weger's alleged removal from this position with the complaint is facially invalid.

On this record, Plaintiffs have not produced evidence substantiating a prima facie case of retaliation where the Department's allegedly materially adverse actions were either: (1) so trivial that they are not the sort of actions that would dissuade a reasonable employee from reporting discrimination or (2) entirely lacking evidentiary support. Therefore, despite the intervening shift in analysis under Burlington Northern, the district court properly dismissed Plaintiffs' retaliation claim.

IV.

In sum, we conclude that the City of Ladue established the Ellerth-Faragher affirmative defense as a matter of law and that Plaintiffs have failed to demonstrate a prima facie case of retaliation. We, therefore, affirm the judgment of the district court, dismissing Plaintiffs' hostile work environment sexual harassment and retaliation claims against the City.[7]

---

[7]Because the Plaintiffs' claims under the MHRA are premised on the same factual bases as their federal claims, they must also fail. See LeGrand, 394 F.3d at 1101.

LOKEN, Chief Judge, concurring.

Relying on cases such as Hall v. Gus Construction Co., 842 F.2d 1010 (8th Cir. 1988), that had nothing to do with applying the Ellerth-Faragher defense, Judge Bye argues that the City failed to satisfy the "correction prong" of the defense because it had actual or constructive notice of *possible* harassment before either plaintiff complained. In my view, this issue is controlled by a portion of the Supreme Court's explicit *holding* in Faragher v. City of Boca Raton, 524 U.S. 775, 807-08 (1998):

> while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

Thus, I find Judge Shepherd's discussion of whether the City had constructive notice to be unnecessary, although I agree with his conclusion. With this caveat, I join in Judge Shepherd's opinion.

BYE, Circuit Judge, concurring in part and dissenting in part.

I join the majority's decision affirming the district court's summary dismissal of plaintiffs' retaliation claims and in concluding the City of Ladue (City) exercised reasonable care to prevent sexually harassing behavior. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775 (1998) (setting forth the Ellerth/Faragher affirmative defense). However, the evidence, when viewed in the light most favorable to the plaintiffs, demonstrates the City had actual and constructive notice of Captain William Baldwin's harassing behavior but failed to exercise reasonable care to promptly correct it. Accordingly, the City may not avail itself of the protections afforded by the Ellerth/Faragher affirmative defense. See Faragher, 524 U.S. at 807.

For purposes of this appeal, there is no dispute the plaintiffs made a prima facie showing of sexual harassment. Because Baldwin was the plaintiffs' supervisor, the City is liable for his wrongful conduct unless it establishes by a preponderance of the evidence it 1) exercised reasonable care to prevent and promptly correct any sexually harassing behavior, and 2) the plaintiffs unreasonably failed to take advantage of any preventive or corrective opportunities provided by the City or to avoid harm otherwise. Id.; Williams v. Mo. Dep't of Mental Health, 407 F.3d 972, 976 (8th Cir. 2005). The first element of the affirmative defense requires an employer to prove it 1) exercised reasonable care to prevent sexual harassment (the "prevention prong"), and 2) promptly corrected any sexual harassment that did occur (the "correction prong"). Faragher, 524 U.S. at 807. Plaintiffs contend the City failed to meet its burden under the correction prong because it had actual and constructive notice of Baldwin's harassing behavior and failed to take prompt and appropriate corrective action. I agree.

I.

As evidence of actual notice, the plaintiffs offer the City's antiharassment policy and the observations of supervisors Sergeant John Wagner and Lieutenant William Baker.

The City's antiharassment policy requires all supervisors to 1) monitor the police department's work environment for any signs of harassment on a daily basis, 2) advise employees about the types of behavior prohibited and complaint procedures, 3) stop all observed acts of harassment regardless of whether the employees involved are under his or her supervision, and 4) take immediate action to limit the work contact between employees involved in a complaint of harassment pending investigation. Additionally, all employees are mandated to report harassment and subject to disciplinary action if they fail to report observed acts of harassment.

-29-

Wagner has been employed with the Ladue Police Department throughout the plaintiffs' tenure. He was a detective when Weger and Murphy were hired and was later promoted to sergeant. As a sergeant, Wagner is a supervisor and subject to the duties imposed by the City's antiharassment policy upon supervisors. In accordance with the policy, Wagner was trained to report sexual harassment. Appellants' App. at A1556. Despite his training, Wagner conceded if the harassment involved a superior officer: "I guess technically I would – I should go over that lieutenan's – you know. I should go above his head, but the reality of it is that's not what you would do." Id. at A1557. Wagner testified he believed reporting a superior officer would place his employment at risk. Id. at A1559.

It is against this backdrop of what Wagner heard or observed which included several instances of conduct perpetrated by Baldwin and were offered by the plaintiffs as sufficient to have afforded the City actual notice of sexual harassment.

The first instance occurred when Wagner was asked by Baldwin to assist in conducting interviews of Weger's neighbors as part of her background check. While canvassing Weger's neighbors, Wagner inquired about Weger's qualifications. Baldwin responded by stating Weger used to have "big" breasts but had breast reduction surgery. Id. at A1562-63. Wagner testified the comments took him by surprise and Baldwin was giggling and told him not to tell anyone. Id.

Wagner had a strikingly similar conversation with Baldwin when Murphy was hired. On this occasion, Wagner, Baldwin, and Lieutenant William Baker (then a detective) were in the detective bureau discussing Murphy's impending hire. Baldwin, in what Wagner characterized as a giggly and childish display, stated Murphy was not much to look at but she had large breasts.[8] Id. at A1568-69. Despite

---

[8]Wagner testified he did not remember if Baldwin used the term breasts or an offensive term.

finding Baldwin's comments "strange" and "inappropriate," Wagner testified he never considered reporting the incident as required by the City's antiharassment policy, id. at A1570, because "it would be uncomfortable," id. at A1572.

On another occasion, Wagner and Officer Richard Bonney were standing in a hallway at the police department and observed Baldwin walking behind Murphy rubbing her shoulders. Id. at A1573. As Murphy walked down the hallway, Baldwin followed behind her rubbing her shoulders telling her: "It'll be okay." Id. In response, Murphy grimaced, id. at A1734, and pulled away from Baldwin's grasp, id. at A1573. Officer Bonney testified that upon observing Baldwin's behavior, Wagner "looked at me and shook his head and said I can't believe this or can't believe that." Id. at A1736.

The plaintiffs further allege Baldwin on occasion crawled under their desks and massaged their legs. Wagner testified he observed Baldwin crawl under the desks of female employees while they were working. Id. at A1576-77. Wagner initially testified he understood Baldwin was under the desks trying to repair something, id. at A1577, but later stated he did not really know what Baldwin was doing, id. at A1578. Still later, Wagner testified he heard from others in the department Baldwin crawled under female employees' desks to rub or feel their ankles. Id.

Finally, Wagner testified he was aware employees in the department referred to Baldwin as "Tickle Me Elmo" and "Captain Tickles," and the nicknames derived from Baldwin's known propensity for tickling and touching female employees. Id. at A1580-81, A1583.

Lieutenant William Baker has also been employed with the Ladue Police Department throughout the plaintiffs' tenure. Like Wagner, Baker was promoted to a supervisory position within the department after the plaintiffs were hired. During such time, Baker became aware Baldwin was engaging in offensive and puerile

conduct directed towards female employees.  Baker knew of Baldwin's comments regarding Weger's breasts and breast reduction surgery because Wagner conveyed them to him in a conversation.  Id. at A1353.  Baker was also present when Baldwin commented on Murphy's breasts and general appearance.  Baker testified Baldwin stated: "She's not much to look at, but she has big tits."  Id. at A1350.  Baker also observed Baldwin on two occasions tickling a female communications supervisor, and on a third occasion saw Baldwin kneeling next to the same supervisor with his arm around her and his face within an inch of her's.  Id. at A1362.  Baker testified he believed the comments and contact were childish and improper.  Id. at A1351, A1362.  He did not, however, report the incidents.

There is no serious dispute over whether these incidents occurred or whether Wagner and Baker found them offensive.  Moreover, there is no dispute they were required, as supervisors, to report their observations under the City's antiharassment policy.  Nonetheless, the majority concludes the City cannot be charged with actual notice of sexual harassment – observed first hand by supervisors charged with the responsibility of reporting such behavior – unless, in addition to actually observing the harassment, the targeted employee tells the supervisors that what they observed and understood to be harassment, was harassment.  I cannot sign on to such a crabbed construction of actual notice.

An employer has actual notice of harassment when sufficient information either comes to the attention of someone who has the power to terminate the harassment, or it comes to someone who can reasonably be expected to report or refer a complaint to someone who can put an end to it.  Young v. Bayer Corp., 123 F.3d 672, 674 (7th Cir. 1999) (citations omitted).  "[A]ctual notice is such notice as is positively proved to have been given to a party directly and personally, *or such as he is presumed to have received personally because the evidence within his knowledge was sufficient to put him upon inquiry*."  Black's Law Dictionary 1061-62 (6th ed. 1990) (emphasis added).  In the context of sexual harassment claims, "[a]ctual notice is established by proof that

management *knew* of the harassment." Watson v. Blue Circle, Inc., 324 F.3d 1252, 1259 (11th Cir. 2003) (emphasis added). Whereas, constructive notice "is established when the harassment was so severe and pervasive that management reasonably *should* have known of it." Id. (emphasis added); see also Martin v. Wal-Mart Stores, Inc., 183 F.3d 770, 772 (8th Cir. 1999) (noting an employer is deemed to have actual notice of a dangerous condition if an employee created or was aware of the hazard).

Given Wagner's and Baker's first hand observations of Baldwin's behavior, it simply cannot be argued they did not *know* the harassment was occurring.[9] Moreover, as supervisors, Wagner and Baker were charged under the City's antiharassment policy with the duty to report and stop any observed sexual harassment. Thus, notice of harassment to either of them constituted notice to the City. See Williamson v. Houston, 148 F.3d 462, 467 (5th Cir. 1998) ("If the employer has structured its organization such that a given individual has the authority to accept notice of a harassment problem, then notice to that individual is sufficient to hold the employer liable."). Despite this evidence, the majority concludes neither Wagner, Baker, or the City can be charged with actual notice of harassment unless a formal complaint was tendered by the victim. In support of this unduly narrow view of actual notice, the majority cites Watson v. Blue Circle, Inc., 324 F.3d 1252, 1259 (11th Cir. 2003), and Minix v. Jeld-wen, Inc., No. 06-16094, 2007 WL 182259, at *2 (11th Cir. June 27, 2007). Neither of these cases supports the majority's conclusion that under Title VII, a supervisor, charged with the responsibility of reporting harassment, is free to ignore it unless a complaint is filed.

---

[9]There may be instances where notice is not conferred by the observation of a single isolated act of harassment or where the objectionable nature of the conduct may not be objectively apparent. Neither of these situations is present here. Wagner and Baker observed several instances of Baldwin's boorish behavior and knew it was harassment.

-33-

Watson, involved allegations by a female employee of a concrete company who claimed she was sexually harassed on the job. 324 F.3d at 1255. The plaintiff offered evidence of numerous incidents of verbal and physical harassment inflicted by male co-workers and customers. Id. at 1255-56. In reversing the district court's grant of summary judgment on behalf of the employer, the court of appeals concluded there were genuine issues of material fact as to whether the employer had actual notice of several of the alleged incidents. Id. at 1259. Among other evidence of actual notice, the court noted the plaintiff presented evidence showing her supervisor had observed her crying after one incident and had been told by other workers the plaintiff was upset by the harassing conduct. Id. Nowhere in the opinion did the court suggest the only means by which the employer could be deemed to have actual notice was if the plaintiff filed a formal complaint of harassment. Indeed, because the Watson court discussed evidence which might provide actual notice short of filing a complaint, it actually contradicts the majority's narrow view of actual notice. Id.

Next, the majority relies on Minix, an unpublished per curiam opinion from the 11th Circuit. 2007 WL 1828259. In Minix, the company had an antiharassment policy which designated certain employees to whom harassment complaints could be made. Id., at *2. A group of employees argued the company had actual notice of their harassment because it had been reported to a co-employee who was not listed among those designated to receive complaints. Id. The court of appeals affirmed the district court's grant of summary judgment because the complaint of harassment had been delivered to the wrong person, i.e., not someone authorized under the policy to receive complaints. The court did not hold that the only way for an employer to receive actual notice of sexual harassment is to be served a complaint.

Unlike Minix, a case from our court supports the plaintiffs' position. See Hall v. Gus Const. Co., 842 F.2d 1010 (8th Cir. 1988). In Hall, the plaintiffs were female employees of a construction company who alleged they were routinely subjected to sexual harassment by male co-employees. 842 F.2d at 1012. Following a bench trial,

the court found in favor of the plaintiffs and the employer appealed, arguing, among other things, it did not have notice of the harassment. This court concluded the employer had actual notice – *knew* of the harassment – because the plaintiffs informed their supervisor *and* the supervisor "observed many of the incidents." Id. Contrary to the majority's assertion, Hall holds that when the agent of an employer observes harassment first hand the employer may be charged with actual notice.

Construing the evidence in favor of the plaintiffs, it is apparent Wagner and Baker knew Baldwin routinely subjected Weger, Murphy, and female employees generally, to loutish behavior which could reasonably be construed as sexual harassment. I am unable to uncover any cases to support the majority's conclusion that the supervisors' first hand observations of Baldwin's conduct were insufficient to charge them and the City with actual notice of the harassment. Nor am I able to divine any principled reason for holding that, in the context of Title VII claims, actual notice should be defined to exclude knowledge gained by experiencing or observing wrongful conduct first hand. Accordingly, I dissent from the majority's contrary conclusion.

II.

I also dissent from the majority's holding as to Weger and Murphy failing to present sufficient evidence to prove the City reasonably should have known of Baldwin's offensive conduct. In addition to the first hand observations of Wagner and Baker detailed above, the record contains the following evidence in support of plaintiffs' claim the City should have known Baldwin was engaged in a pattern of sexual harassment.[10]

---

[10]The majority notes the district court considered six examples of alleged sexual harassment. We are limited by the record – not by what the district court chose to consider.

Weger and Murphy: Murphy testified Wagner told her, within a few months of her hire, that Baldwin had commented she "wasn't much to look at, but . . . had big tits." Appellants' App. at A159. Similarly, Weger testified she told Baldwin during her interview process she had undergone breast reduction surgery. Some months later, Wagner told her Baldwin informed him of her surgery during the background investigation. Id. at A276-79. Weger further testified she was uncomfortable when she realized the information had become known throughout the department and officers commented that "it didn't even look like you had a procedure." Id.

The plaintiffs also testified they were present when Baldwin harassed other female employees, and were subjectively aware of those incidents. For example, Murphy was present when Baldwin crawled under Goin's workstation and then massaged her shoulders. Id. at A150-51. She was also privy to incidents involving Allison, the communications supervisor. Id. at 51. Weger testified she witnessed instances when Baldwin tickled Allison and hugged Murphy. Id. at A267.

Detective Chris Schmitz: Schmitz testified he heard Baldwin referred to by other members of the police department as "Captain Tickles" and "Tickle Me Elmo." He stated the nicknames were in reference to Baldwin's known propensity for tickling female employees. Appellants' App. at A1619-22. Schmitz also described an incident involving Baldwin and a female employee, Kristin Goin. Schmitz stated he stopped by the dispatch workstations to speak with Murphy. While there, he noticed Baldwin lying on the floor underneath Goin's workstation. After several minutes, Baldwin stood up and began massaging Goin's shoulders, telling her everything would be alright and not to worry. Id. at A1626-27. Schmitz testified Baldwin only stopped after Goin said: "Sir, if you don't mind." Schmitz believed Baldwin's actions were inappropriate but did not report them out of fear for his employment. Id. at A1627-28. Finally, Schmitz testified that when Baldwin conducted interviews of prospective female employees, he would come down to the detective bureau after the

interviews and describe each applicant's appearance to the officers present using terms like: "big tits, great ass, nice long legs or dick-sucking lips." Id. at A1646-47.

Detective Glen Norman: Norman testified on one occasion he entered the communications area where Murphy worked and observed Baldwin with his arm around her shoulder, leaning close to Murphy's face. Id. at A1664-66. Norman testified Murphy abruptly stood up and walked towards him. As she did, Murphy whispered: "I can't stand him." Id. Norman further testified he had heard from others that Baldwin stated Weger would be difficult to fit for a bulletproof vest because she had large breasts and "Murphy was not much to look at, but somebody would be f–ing that before long." Id. at A1666-67. Norman indicated he discussed those comments with co-workers Schmitz and Bryan Lucas. Finally, Norman testified he was aware Baldwin was known throughout the department as "Captain Tickles" and "Tickle Me Elmo" because he frequently tickled female employees. Id. at A1680-81.

Detective Bryan Lucas: Lucas confirmed Baldwin was known throughout the department as "Captain Tickles" and "Tickle Me Elmo," and acquired the nicknames because he was known to tickle female employees. Id. at A1701-02. Lucas testified he observed Baldwin tickle dispatcher Pat Allison. Lucas stated: "I heard her start to laugh, and then I heard her say, Captain Baldwin, quit it, sir, you're so bad while she was laughing." Id. at A1703-04. Lucas testified he found the incident odd and later mentioned it to Chris Schmitz. Id. On another occasion, Lucas entered the dispatch area and observed Baldwin standing by Weger rubbing her shoulders. As he walked by, Lucas observed Weger roll her eyes "[l]ike she was kind of putting up with it[.]" Id. at A1705. Lucas also testified he was present when Baldwin discussed female applicants or employees. He specifically recalled being in the detective bureau along with Schmitz when Baldwin described one applicant has having large "tits". Id. at 1706. Lucas further testified he had discussed Baldwin's inappropriate conduct with other members of the department, including Schmitz and Baker, who reported observing similar conduct. Id. at A1709-11. Notwithstanding the City's

antiharassment policy, Lucas stated: "I wouldn't have been real thrilled about coming forward and saying anything." Id. at A1713.

Officer Richard Bonney: Bonney testified he observed Baldwin come up behind Murphy when she was facing the copier, grab her around the waist, and tickle her. When Murphy told him to stop he let go of her but followed behind as she walked to her desk "with his hands out as if he was going to tickle her again, and she . . . told him to leave [her] alone." Id. at A1733. On another occasion, Bonney witnessed Baldwin rubbing Murphy's shoulders as she walked down a hallway. Bonney stated: "[S]he grimaced and turned away from him like – as if to break his grip off of her shoulders." Id. at A1734.

"Constructive notice . . . is established when the harassment was so severe and pervasive that management reasonably should have known of it." Watson, 324 F.3d at 1259. "[A]n employer may be charged with constructive knowledge of previous sexual harassment . . . if the harassment was so broad in scope, and so permeated the workplace, *that it must have come to the attention of someone authorized to do something about it*." Fall v. Ind. Univ. Bd. of Tr., 12 F. Supp. 2d 870, 882 (N.D. Ind. 1998) (emphasis added) (citations omitted).

> [T]here can be constructive notice in two situations: where an employee provides management level personnel with enough information to raise a probability of sexual harassment in the mind of a reasonable employer, or where the harassment is so pervasive and open that a reasonable employer would have had to be aware of it.
>
> . . .
>
> [T]hese standards strike the correct balance between protecting the rights of the employee and the employer by faulting the employer for turning

a blind eye to overt signs of harassment but not requiring it to attain a level of omniscience, in the absence of actual notice . . . .

Kunin v. Sears Roebuck and Co., 175 F.3d 289, 294 (3d Cir. 1999).

Viewed in the light most favorable to the plaintiffs, the evidence establishes conclusively that Baldwin's harassing behavior *came* to the attention of Wagner and Baker, and, as supervisors, they were authorized – in fact mandated – to do something about it under the City's antiharassment policy. Such evidence alone is sufficient to prove actual notice – I cannot fathom how it also fails the majority's constructive notice test.

Additionally, however, several other employees testified Baldwin's antics were common knowledge within the department. He was known throughout as "Captain Tickles" and "Tickle Me Elmo" because of his affinity for tickling female employees. Employees talked openly with one another about Baldwin's behavior, describing it as childish, odd, and offensive. Moreover, Baldwin's offensive conduct was not reserved for the plaintiffs. The evidence demonstrates he harassed other female employees similarly. Considering all the evidence marshaled by the plaintiffs, a reasonable employer should have been aware of Baldwin's sexual harassment. The harassment occurred frequently, continued over a period of years, was obvious to those who observed it, and would have been easily discoverable by the City's representatives.

In its analysis of constructive notice, the majority considers only six incidents of harassment, thereby discounting or ignoring most of the incidents detailed within the record. For example, the majority does not mention incidents of harassment involving other female employees. The majority's failure to consider this evidence is neither legally nor factually sound.

The plaintiffs did not offer evidence relevant to the City's constructive notice to prove their substantive sexual harassment claims. If plaintiffs were unaware of these incidents, the evidence has no bearing on their subjective perceptions of the workplace. Conversely, the evidence is highly probative of whether the City, had it been paying as much attention as a reasonable employer, should have discovered Baldwin's sexual harassment. When judging the severity and pervasiveness of workplace sexual harassment, our court has long held that harassment directed towards other female employees is relevant and must be considered. See Hall, 842 F.2d at 1014-15 ("We also reject appellants' contention that the district court erroneously considered all of the women's claims together in determining that the harassment was sufficiently pervasive and severe . . . .").

In Williams v. Conagra Poultry Co., 378 F.3d 790, 793-94 (8th Cir. 2004), this court discussed the distinction between evidence offered to prove the substance of a plaintiff's hostile work environment claim versus evidence offered to prove the severity and pervasiveness of harassment in the workplace. In Williams, the plaintiff (Williams) offered the testimony of several co-workers detailing a host of racially motivated harassment which occurred during his employment at Conagra's plant. Id. at 793. Conagra objected because Williams conceded he was unaware of the incidents, and according to Conagra, the evidence could not be used to prove Williams found the workplace subjectively hostile. Id. at 794. This court, recognizing the evidence was irrelevant to Williams's subjective perceptions of his workplace, nonetheless found the evidence highly relevant to prove, among other things, the type of workplace environment Williams was subjected to. Id. Therefore, evidence not relevant to prove a plaintiff's subjective perceptions may be relevant for other purposes.

The same reasoning applies here. Assuming plaintiffs were unaware of the incidents, they cannot be used to prove their substantive hostile work environment claims. The evidence is, however, relevant to the issue of constructive notice. In

-40-

other words, taking into account the sum of Baldwin's objectionable behavior, its frequency, duration, and blatancy, should a reasonable employer have discovered it?

Assume a supervisor discloses to a second supervisor his intention to engage in behavior towards female employees clearly constituting sexual harassment, or admits to having previously engaged in sexual harassment towards female employees. Such an admission would be compelling evidence of the employer's actual and constructive notice, i.e., did someone with authority know or should someone with authority have known about the harassment. Under the majority's reasoning, this clear evidence of notice would be disregarded because no complaint was made. Nothing in the cases I have uncovered suggests Title VII allows employers to turn a blind eye to what is discovered or reasonably discoverable in the workplace. The evidence offered by the plaintiffs which demonstrates the breadth of Baldwin's offensive behavior is clearly relevant to prove whether the City acted reasonably in failing to discover what was occurring within the police department.

### III.

The plaintiffs have presented sufficient evidence to show the City knew or should have known of Baldwin's harassing behavior and failed to act promptly to correct the harassment. Therefore, the City has not proved the affirmative defense. Accordingly, I would reverse the grant of summary judgment and remand for further proceedings. I respectfully dissent.

_____